Juan Chavez, OSB #136428
PO Box 5248
Portland, OR 97208
Tel: 503-944-2270
Fax: 971-328-3982

      Attorney for Plaintiff

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| PHILLIP SITBON, | Case No. 3:22-cv-01148-SI |
| Plaintiff, | |
| v. | DECLARATION OF JUAN CHAVEZ |
| CITY OF PORTLAND, PORTLAND POLICE BUREAU OFFICER CRAIG LEHMAN, and JOHN DOES 1-10, | |
| Defendants. | |

I, Juan Chavez, submit the following declaration:

1.  I am the Counsel of Record for the Plaintiff.

2.  I make this declaration in support of our Brief in Response to Defendant City of Portland and Defendant Craig Lehman's Motions for Summary Judgment for the purpose of identifying exhibits.

3.  Attached to this Declaration is an excerpt from the Deposition of Phillip Sitbon.

4.  Attached to this Declaration is an excerpt from the Deposition of Craig Lehman.

5.  Attached to this Declaration is an excerpt from the Deposition of Carissa Desmond.

6.  Attached to this Declaration is an excerpt from the Deposition of Ross Caldwell.

7.  Attached to this Declaration is an excerpt from the Deposition of Erik Kammerer.

Page 1 – DECLARATION OF JUAN CHAVEZ

8.  Exhibit 1 to this Declaration is a true and correct copy of the Force Data Collection

Report filled out by Craig Lehman regarding his use of force against Phillip Sitbon on

August 6, 2020. This document was produced under the parties' Stipulated Protective

Order, but the parties have agreed that it can be used unsealed.

9.  Exhibit 5 to this Declaration is a true and correct copy of the video from investigation

2020-c-0280 depicting Craig Lehman pushing David Bowen to the ground. This exhibit

is saved to a flash drive that has been filed conventionally with the Court.

**I hereby declare that the above statement is true to the best of my knowledge and belief,
and that I understand it is made for use as evidence in court and is subject to penalty for
perjury.**

DATED: March 17, 2025.

*/s/ Juan C. Chavez*
Juan C. Chavez, OSB #136428
Oregon Justice Resource Center
P.O. Box 5248
Portland, OR 97208

Attorney for Plaintiff

Page 2 – DECLARATION OF JUAN CHAVEZ

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION



PHILLIP SITBON,

      Plaintiff,

v.                     CASE NO.: 3:22-cv-01148-SI

CITY OF PORTLAND, PORTLAND POLICE BUREAU
OFFICER CRAIG LEHMAN, and JOHN DOES 1-10,

      Defendants.

_____

VIDEOTAPED DEPOSITION OF

PHILLIP SITBON

TAKEN ON
MONDAY, FEBRUARY 26, 2024
9:40 A.M.

OREGON JUSTICE RESOURCE CENTER
511 SOUTHWEST 10TH AVENUE
PORTLAND, OREGON 97205



NAEGELI
DEPOSITION & TRIAL

(800) 528 - 3335
NAEGELIUSA.COM


Nationwide

COURT REPORTING

LEGAL VIDEOGRAPHY

REMOTE DEPOSITIONS

TRIAL PRESENTATION

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS


Powerful
LITIGATION SUPPORT

APPEARANCES

**Appearing on behalf of the Plaintiff:**

JONATHAN GERSTEN, ESQUIRE

AMANDA L. LAMB, ESQUIRE

**Oregon Justice Resource Center**

511 SW 10th Avenue

Portland, OR 97205

(503) 944-2270

(971) 279-4748 (Fax)

jgersten@ojrc.info

alamb@ojrc.info


**Appearing on behalf of the Defendant,**

**City of Portland:**

WILLIAM W. MANLOVE, ESQUIRE

**Portland City Attorney's Office**

1221 SW 4th Avenue, Suite 430

Portland, OR 97204

(503) 823-4047

william.manlove@porlandoregon.gov

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

**APPEARANCES (CONTINUED)**

**Appearing on behalf of the Defendant,**

**Officer Craig Lehman:**

KAREN O'KASEY, ESQUIRE

**Hart Wagner LLP**

1000 SW Broadway, Suite 2000

Portland, OR 97205

(503) 223-4499

(503) 222-2301 (Fax)

kok@hartwagner.com

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

Q.    And what does that mean; can you --

A.    I was --

Q.    What were you doing that you thought were sort of press or media related activities?

A.    Aside from interviewing people, I was capturing the events happening at the protests, which I consider to be a journalistic activity.

Q.    Did you wear any -- on your clothing that you wore during these protests, did you have any sort of insignia or markings indicating that you were press or media?

A.    I did, yeah.  Various things.

Q.    What were the various things that you wore on your clothing to identify yourself as press or media?

A.    At minimum, a badge around my neck, press badge.  And then often, a patch on my backpack that said press.  And I, at one point, acquired a helmet that I got patches for that also said press on them, in both reflective and in glow-in-the-dark lettering.

Q.    And you mentioned that you obtained helmets during the -- again, we're talking about the protests in 2020, prior to August 6 of 2020 --

A.    Mm-hmm.


NAEGELI DEPOSITION & TRIAL    CELEBRATING 40 YEARS IN BUSINESS    (800)528-3335    NAEGELIUSA.COM

Q.    During your protest activities in 2020, did you ever see people using green laser pointers to shine in the eyes of police officers?

A.    No.

Q.    Did you ever use a green laser pointer?

A.    No.

MS. LAMB:    Bill, if we're coming at a stopping point, could we take a break soon?

MR. MANLOVE:    Yeah.    Just give me, like, just a second here.

MS. LAMB:    Okay.

BY MR. MANLOVE:

Q.    So prior to August 6th or 2020, I mean, the police never confiscated or took any of your recording equipment, correct?

A.    Correct.

Q.    Okay.    And they didn't prevent you from recording or filming in any of the protest activities, correct?

A.    I wouldn't say that.

Q.    How did they prevent you from filming or recording?

A.    Very often with their own lights.

Q.    What do you mean?

A.    They would shine lights at cameras.



NAEGELI DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

Q.    How often would that happen?

A.    Often.

Q.    What does that mean?  Can you give me an estimate.  In the 15 to 20 --

A.    I'd say --

Q.    -- protests that you participated in prior to August 6 of 2020?

A.    Maybe at one point during the night at almost every single one of those instances.

Q.    Did the police -- did the police shining their lights at you, did that -- it doesn't cause you to stop recording, did it?

A.    No, but it obscured the view of the cameras.

Q.    With respect to publishing or posting your recordings, or -- I mean, how often was it sort of something you were doing; every night, or how often would do that?

A.    So my recordings were live.

Q.    Mm-hmm.

A.    So it went straight to viewers.

Q.    Okay.  And what -- what platform was this -- would the viewers see your video on?

A.    Most often on Facebook earlier on.  And later, I started using a service called Restream.io

A.    Correct.

Q.    And your response was, quote, "Keep your light off.  Go fuck yourselves.  Listen to him, he's whining like a fucking child," close quote.

You said that to the -- that was your response to the police telling you, turn off their light, correct?

A.    Correct.

Q.    Turn off your light, correct?

A.    Indeed.

Q.    Pardon me?

A.    Yes.

Q.    And again, on Exhibit 7, where you're using the Tiny Monster TM28, you say to Ms. Desmond or others nearby that, quote, "They hate it so much."  Quote, "They really hate it."  Referring to your flashlight, correct?

A.    Correct.

Q.    You knew the police didn't want you shining either flashlight in their eyes, but you continued to shine your flashlight at them; isn't that correct?

A.    Correct.

Q.    Why did you do that?

A.    Because it was lawful.


NAEGELI
DEPOSITION & TRIAL    CELEBRATING 40 YEARS IN BUSINESS    (800)528-3335
NAEGELIUSA.COM

Q.    Why -- why do you believe that it was lawful to shine the TM28 into the eyes of the police officers on August 6 of 2020?

A.    Well, my intent was not to shine into their eyes.  And in fact, I avoided their eyes most of the instances where I shined that flashlight.

But my purpose was to illuminate the subject of my video.

Q.    Regardless of whether that may have been your -- your purpose, it is true, isn't it not, that we see on Exhibit 6 and 7, that at times, you are shining your light, and either the smaller flashlight or the larger flashlight, the TM28, into the eyes of the police, correct?

A.    Perhaps.

Q.    And -- and you knew that was happening because they -- they made statements to that effect telling you, stop blinding us, correct?

A.    Correct.

Q.    You can hear that on the video.

A.    I believe when they made that statement, they were in the process of attempting to blind us with their lights.

So I didn't really have much sympathy for their complaints.

intersection of 106th and Washington?

A.    Yes.

Q.    Did you see anybody else using anything like a TM28 at this time at this intersection of 106th and Southeast Washington?

A.    I saw other flashlights on the wall back there. And I may have seen other people with flashlights out of the corner of my eye.

Q.    So at 29 seconds in this video, Officer Lehman is clearly illuminated with a light, bright light, in his eyes, in his face, correct?

A.    Correct.

Q.    Is it your testimony that that's not your light?

A.    No, my testimony is that I can't be sure that that's my light because of my comment saying here that I turned off my light.

Q.    Okay.  At 33 seconds, the police officers are not illuminated, correct?

A.    Mm-hmm.

Q.    And there is a single light from the direction of the police being shined in the direction of the videographer, correct?

A.    Correct.

Q.    All right.  So at 36, you're saying,

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

Case 3:22-cv-01148-SI    Document 65    Filed 03/17/25    Page 12 of 90

quote, "It's off, turn it off."

A. Mm-hmm.

Q. All right. And at 36, there are lights that are shining in your direction from, apparently, the police, correct?

A. Correct.

Q. So at 40 seconds, quote, "fuck you, it's off." That's you?

A. Mm-hmm.

Q. So you're talking about your light?

A. Yeah.

Q. All right. All right. At 49 seconds, Officer Lehman is illuminated, correct?

A. Correct.

Q. And there's a flashlight from the police shining in your direction, correct?

A. Correct.

Q. This illumination that we see in -- at 49 seconds on Exhibit 8, that illumination of Officer Lehman was coming from your flashlight, isn't it?

A. It could be.

Q. Yeah. You turned it off --

A. Mm-hmm.

Q. -- but you turned it back on, correct?

A. I did. But I shined it over their heads,

Case 3:22-cv-01148-SI   Document 65   Filed 03/17/25   Page 13 of 90

Q.   Both eyes.  Okay.  Were you wearing any glasses or a covering at the time?

A.   I was not.

Q.   Prior to Officer Lehman using the pepper spray on you, did you hear him say anything to you?

A.   No.

Q.   Did you say anything to him?

A.   No.

Q.   How long did it seem that Officer Lehman deployed the -- or -- used the pepper spray?

A.   Maybe two seconds.

Q.   Did it seem like it was a single burst of pepper spray?

A.   I think so.

Q.   As he was using it, or maybe afterwards, did you hear him say anything to you?

A.   No.

Q.   Did you say anything to him?

A.   No.

Q.   The pepper spray had some sort of physical effect on you?

A.   Yes.

Q.   Can you describe those effects for us today?

A.   Burning all over my skin, and in my eyes,

in my nose and mouth.  Difficulty breathing, shortness of breath.

Q.    Any other effects, physical effects?

A.    Pain on my skin and in my eyes.

Q.    When you say a burning all over your skin, do you mean on your face?

A.    On my face, my hands that were exposed, and down my shirt where it was dripping, in my hair, one of my ears, maybe even down my back at one point.

Q.    You said it was painful and you described it as burning.  Was there any other sort of adjectives that you would use to describe the pain, other than burning?

A.    Hot, sharp, not intense at first, but then, you know, shortly after it became much more intense.

Q.    When you say shortly after, what do you mean? Within a minute, or --

A.    Within moments, yes.

Q.    With moments.  Okay.  So how long did these effects that you're describing, how long did they last?

A.    A matter of hours, I would say.

Q.    With respect to -- did you receive any

Q.    All right.  So I'm going to read to you sections of this document.  And I'm going to ask you some questions about it.

The first sentence reads, quote, "City admits the plaintiff attended a protest in southeast Portland, in the area around the City's police bureau's East Precinct, at 737 Southeast 102nd Street in Portland," close quote.

This sentence is -- that's a truthful and accurate statement; is it --

A.    Yes.

Q.    -- do you agree?

A.    Yes.

Q.    A little bit further down below it says, quote, "On August 6, 2020, or the early morning hours of August 7th, 2020, plaintiff intentionally and repeatedly shined a high-powered light at police officers."

That statement is truthful and accurate, correct?

A.    Not at all.

Q.    How is that not a truthful and accurate statement of what you did that evening at -- on those dates?

A.    It was not intentional.

Q.    Is there any other part of that sentence, in your view, that's not truthful or accurate?

A.    What constitutes a high-powered light?

Q.    The Tiny Monster TM28.

A.    Okay.  So there's -- is there, like, a lumen level that qualifies it as a high-powered light?

Q.    Well, I provided that definition of what I'm referring to as a high-powered light.

That was the light you used, correct?

A.    Yes, it is.

Q.    The Tiny Monster TM28?

A.    Yes.

Q.    At times, on August 6, 2020, or August 7th, 2020, correct?

A.    Correct.

Q.    So other than intentionally, is there any other part of that sentence that is inaccurate or untruthful?

A.    I think repeatedly doesn't really represent my behavior either.

Q.    Well, you shined the Tiny Monster T28 [sic] more than once, correct, at the police?

A.    In their direction, yes.

Q.    You need to answer out loud.

NAEGELI
DEPOSITION & TRIAL          CELEBRATING 40 YEARS IN BUSINESS          (800)528-3335
NAEGELIUSA.COM

A.    I shined it in their direction, yes.

Q.    Well, you shined it in their faces more than once, didn't you?

A.    Not intentionally.

Q.    The next sentence reads, quote, "Plaintiff was aware of the invasive, harassing, and unlawful nature of his conduct of shining a high-powered light at the City's police officers."

That sentence is truthful and accurate, isn't it?

A.    No.

Q.    And how is it not truthful or accurate?

A.    I don't agree that it was invasive, harassing, or unlawful.

Q.    And why do you disagree that you shining the Tiny Monster T28 in the faces of one or more police officers was not invasive?

A.    Shining it in the direction of one or more police officers was not invasive because it was me doing my job.

Q.    Was shining the light in their faces?

A.    Shining the light in their direction to make them --

Q.    I'm asking --

A.    -- identifiable.

Case 3:22-cv-01148-SI   Document 65   Filed 03/17/25   Page 18 of 90

Q.   -- you, regardless of whether your conduct was intentional or what you seem to be saying now, some kind of mistake, when the light shined --

MS. LAMB:   Objection.   That miss -- that misinterprets his testimony.

MR. MANLOVE:   All right.   Let me rephrase it.

BY MR. MANLOVE:

Q.   Regardless of your characterization of your conduct, the fact that the light was shined in the faces of one or more police officers, why is it your view that that's -- that wasn't invasive?

A.   Because I was illuminating the subject of my video.   And the intention was never to harass or harm.

And so, I made a point of, you know, limiting the amount of light in their faces, and trying, you know -- and focused on my objective, which was to, more broadly, illuminate all of the officers and make their badge numbers and their helmet numbers identifiable.

Q.   The next sentence reads, quote, "In some cases, the City's police officers responded to plaintiff's conduct by shining their lights at plaintiff, telling plaintiff that the police

spondylitis; you know, do the symptoms that you described -- well, let me take that back.

You described the nature -- your understanding of the nature of this disease, correct?

A.   Mm-hmm.

Q.   So I take it that this disease manifests itself in certain physical symptoms on your body, correct?

A.   Correct.

Q.   What are those physical symptoms that ankylosing spondylitis -- how does it affect your body?

A.   Well, the -- the primary symptom is constant severe pain throughout my spine, especially around the neck.  That can change depending on the progression of the disease.

And these symptoms started about 23 or so years ago.  And so, the disease had a lot of time to progress before I actually got a diagnosis and got treated.

So I have significant fusion of the spine, especially in the cervical area, and -- and also down in the lumbar and sacral area.

Q.   The -- the pain that you feel; is it -- is

Case 3:22-cv-01148-SI    Document 65    Filed 03/17/25    Page 20 of 90

it's always there.

Q.    And this is some -- this -- this pain that we're talking about in your spine -- that's something you've, even though you were diagnosed six or -- six years ago, you've -- you've been experiencing these symptoms most of your adult life; is that what you're saying?

A.    Yes.

Q.    Okay.  Can these symptoms be aggravated?

A.    Yes.

Q.    What are the types of things that can aggravate these symptoms?

A.    Anything with inflammatory properties, including foods.

Q.    Can walking aggravate your symptoms of ankylosing spondylitis?

A.    Sometimes.

Q.    Can carrying something in your hands aggravate the symptoms of ankylosing spondylitis?

A.    Sometimes.

Q.    Does drinking alcohol -- do you drink alcohol?

A.    Generally, no.  Because yes, it can.

Q.    It can.  You have -- you have on occasion had some alcohol?

A.    Yeah.

Q.    Does alcohol aggravate these symptoms of pain that you're describing?

A.    It can.

Q.    What about smoking tobacco; does that aggravate the symptoms?

A.    It can.

Q.    What about smoking marijuana; does that aggravate the symptoms that you feel with ankylosing spondylitis?

A.    No.

Q.    Were you smoking on August 6th of 2020?

A.    I believe so.

Q.    And what were you smoking?

A.    Pre-rolled joints.

Q.    Okay.  Pre-rolled joints of marijuana?

A.    Yes.

Q.    Who pre-rolled them?

A.    The dispensary.

Q.    Okay.  All right.  Your lawyers have said that Officer Lehman's use of pepper spray has aggravated your symptoms of ankylosing spondylitis; is that correct?

A.    Yes.

Q.    I need you to tell me in as much detail as

possible how did his use of pepper spray aggravate your symptoms?

A. Well, like with other -- like with inflammatory things, like foods or alcohol, it starts out, you know, I just feel more stiff than normal.

And I don't necessarily notice that there's more pain or aggravation. But if I'm moving around enough, then it becomes noticeable. It gets harder to turn my head, and even to close my hand. And my hands usually get swollen.

And I -- I get peripheral pain, like, in my hands and feet as well at times, which is sort of what the Methotrexate was for.

And as far as I come to understand from the doctors, that's a sign of increased inflammatory activity within my immune system.

And so, these are all things I -- I experienced that night.

Q. How long do these symptoms last?

A. Well, I kind of have to guess because, like, the -- you know, again, the overarching issues, the symptoms never really go away fully.

But I'd say it was a number of days before I felt like I was free of any aggravating effects.

training, discipline, or supervision?

A. Not currently.

Q. Okay. As we sit here today, that's -- those are topics that you really can't provide any information about, correct?

A. Correct.

Q. With respect to this particular use of force that's at issue, the 8/6/2020 use of pepper spray, you -- you filed your tort claim notice.

Were you -- did you ever give an interview to anyone from the police bureau -- or -- the City's Independent Police Review Division?

A. No.

Q. Why not?

A. I didn't understand that was part of the process.

Q. Okay. As I understand it, from your testimony today, as far as you recall, you don't remember Officer Lehman ever saying anything to you, correct?

A. Correct.

Q. The complaint talks about your -- your -- what the lawyers have called your speech activities, your speech that evening.

Is it fair for me to infer from that, that

what that means is your participation as a member of the press that you saw, and -- and filming and recording, and livestreaming police activities and protest activities?

A.    Yes.

Q.    That's your -- the -- the -- is that the sum total of your speech activities, at least on this particular evening?

A.    Yeah.

Q.    Okay.  So could you look at Exhibit 16 again.  This is the official legal document of the interrogatories.

So number 2, all known contact info for all witnesses to the incident.

So we've identified Carissa Desmond --

A.    Mm-hmm.

Q.    -- and that's -- to your knowledge, that's the only one, correct?

A.    Yes.

Q.    Okay.  Take a look at number 4.  I've asked your lawyers to identify, with particularity, the nature and amount of all economic damages.

You know, like damages are things like lost wages, medical bills, that type of stuff.  They've said none.

though.

Q.    Meaning, you could come back to work at some point if you wanted to?

A.    Yes.

Q.    Did you collect unemployment after you were laid off?

A.    Yes.

Q.    Did you ever apply to go back to work at Intel after taking that layoff?

A.    No.

Q.    Your lawyers sent us a list of the number of protests that you were involved in in 2020.  And it lists 28 protests.

Have you seen that list?

A.    Yes.

Q.    Before the August 6th protest, you were in 23 other protests; is that accurate?

A.    Yes.

Q.    Did you start livestreaming during your first protest on June 17th?

A.    Yes.

Q.    Did you live stream during every other protest after that up to this August 6th protest?

A.    Yes.

Q.    Did you use the Tiny Monster Flashlight

during those other 23 protests?

A.    At times.

Q.    Did you use a light attached to your GoPro like you've already described to us?

A.    Yes.

Q.    Did you use another kind of handheld flashlight in addition to or other than the Tiny Monster during those other 23 protests?

A.    Yes.

Q.    You said at one point that you were doing your job.  Do you remember saying that?

A.    Yes.

Q.    Were you being paid by someone to live stream?

A.    No.

Q.    Did you get paid by any source of any kind for any of the content that you live streamed?

A.    No, that was a figurative statement.

Q.    Okay.  You didn't have a supervisor telling you what you could or could not live stream?

A.    That's correct.

Q.    During any of those 23 protests before the August 6th protest, do you remember any police officers asking you to turn your lights off?

A.    I don't recall that, no.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

CERTIFICATE


I, the undersigned, Ron Pestes, am a videographer on behalf of NAEGELI Deposition & Trial. I do hereby certify that I have accurately made the video recording of the deposition of Phillip Sitbon, in the above captioned matter on the 26th day of February, 2024 taken at the location of Oregon Justice Resource Center at 511 South West 10th Avenue in Portland, Oregon 97205.


No alterations, additions, or deletions were made thereto.


I further certify that I am not related to any of these parties in the matter and I have no financial interest in the outcome of this matter.


_____

                    Ron Pestes

CERTIFICATE


I, Mark Higgs, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.


I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.


IN WITNESS HEREOF, I have hereunto set my hand this 11th day of March, 2024.




_____
                Mark Higgs

**Craig Lehman**

                 IN THE UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF OREGON

                      PORTLAND DIVISION


PHILLIP SITBON,

            Plaintiff,

   v.                          Case No. 3:22-cv-01148-SI

CITY OF PORTLAND, PORTLAND

POLICE BUREAU, OFFICER CRAIG

LEHMAN, and JOHN DOES 1-10,

            Defendants.


          VIDEOTAPED DEPOSITION OF CRAIG LEHMAN

             Taken in behalf of the Plaintiff

             Wednesday, February 28, 2024

                   Portland, Oregon


       BE IT REMEMBERED THAT, pursuant to the

Federal Rules of Civil Procedure, the videotaped

deposition of CRAIG LEHMAN was taken before

Kimberly M. Harrison, an Oregon Certified Shorthand

Reporter and Registered Professional Reporter, on

Wednesday, the 28th of February, 2024, at 9:04 a.m., in

the law offices of Hart Wagner, LLP, 1000 SW Broadway,

Suite 2000, Portland, Oregon.

**Craig Lehman**

APPEARANCES

Appearing on behalf of the Plaintiff:

Ms. Amanda L. Lamb

Mr. Franz H. Bruggemeier

Mr. Jonathan Gersten

Oregon Justice Resource Center

711 NE 75th Avenue

Portland, OR 97213

(503)568-3659


Appearing on behalf of the Defendant City of Portland:

Mr. William W. Manlove

Portland Office of City Attorney

1221 SW 4th Avenue, Suite 430

Portland, OR 97204

(503)823-4047


Appearing on behalf of the Defendant Lehman:

Ms. Karen O'Kasey

Hart Wagner, LLP

1000 SW Broadway, Suite 2000

Portland, OR 97205

(503)222-4499


ALSO PRESENT:  Randy Stenquist
               Jake Quain, Videographer

Craig Lehman

Q     Right.

A     Yeah.

Q     Okay.  What is physical resistance?

A     Can I turn back to the front --

Q     Yes.

A     -- to look at the definitions?

Q     That one is -- is defined on page 2.

A     Do you want me to read it?

Q     Yeah.  Read it out loud, please.

        MS. O'KASEY:  Slowly.

        THE WITNESS:  Yeah.  "Physical Resistance: A person's physical attempt to evade a member's control that does not rise to the level of active aggression."

BY MS. LAMB: (continuing)

Q     Can we look at the definition of "active aggression" now?  That's on page 1.  And can you read the definition of "active aggression," please?

A     Yes.  "Active aggression is a threat or overt" -- "overt act of an assault (through physical or verbal means), coupled with present ability to carry out the threat or assault, which reasonably indicates that an assault or injury to any person is about to happen, unless intervention occurs."

Q     Okay.  So having read both of those definitions and based on your training and experience,

Craig Lehman

A    Yeah.  I don't how to say that.

Q    **You can go ahead, if you want to mark the direction of the light -- the origin point of the light, the direction.**

A    (Marking.)

Q    **Thank you.**

**Okay.  So you said you -- you remembered a bright light being projected from a direction you just marked on the map.  What else do you remember?**

A    I remember officers were blinded by the light, and they couldn't see, and they were squinting their eyes.

Q    **Do you recall any of the officers discussing the light?**

A    I don't remember.

Q    **Do you recall knowing who was shining the light?**

A    As the light was being shone?

Q    **Yes.  Could you see the individual who was shining the light?**

A    I could see where it was coming from.

Q    **The direction?**

A    Yes.

Q    **Okay.  But you couldn't see the individual shining the light?**

Craig Lehman

A     Not from my vantage point right there.

Q     **To your knowledge, did anybody see the individual at that time?**

A     I don't know.

Q     **Okay.  Do you remember what you heard?**

A     I don't remember.

Q     **Okay.  Do you recall the demeanor of the crowd at that time?**

A     I would say it was escalated, aggressive.

Q     **What makes you say that?**

A     We were being hit with projectiles.

Q     **What kind of projectiles?**

A     Water bottles, rocks.

Q     **And I just want to be clear, so at the -- at the time you remember seeing the bright light, you were also being hit with projectiles at -- at that time?**

A     During the same time period, yes.

Q     **"Same time period" meaning -- meaning what? At the same time or -- or not?**

A     Well, it was happening throughout the course of the event.

Q     **Okay.  Do you recall -- prior to your using pepper spray, do you recall multiple instances of -- of bright lights being shone at officers that evening?**

A     Not specifically.

Craig Lehman

A    The light stopped, and the suspect that was pointing the light disappeared in the crowd.

**Q    And where did you go after you deployed pepper spray?**

A    I went back with my squad.

**Q    And did you -- did you take any other action that night related to this particular incident?**

A    No.

**Q    Okay.  Did you encounter the same person again?**

A    I have no idea.

**Q    Okay.  After you deployed pepper spray, did you continue to watch that individual?  Did you see what -- did you see where that individual went?**

A    I did not.

**Q    Okay.  Let's go back to when you decided to use pepper spray.  Did you communicate that decision to anybody around you at the time?**

A    I don't remember.

**Q    Okay.  Do you recall if anybody ordered or asked you to take action?**

A    No.

**Q    No, you don't recall?  Or, no, they didn't?**

A    No, I don't remember.

**Q    Okay.  Okay.  Based on your recollection, the**

Craig Lehman

expectation that these FDCRs are required to be completed within a few days of the use of force?

A    Yes.

Q    If they -- if they aren't, what happens?

A    I don't know, because I've never seen that happen.

Q    Okay.  Okay.  Is -- to your knowledge, is there somebody checking to make sure that officers fill them out in a timely manner?

A    Yeah.  I mean, there's a level of personal responsibility there.

Q    Okay.  Let's look at -- one moment.  Can you look at Bates No. 2434 of this document?  And at the bottom of the page, it says -- there's a -- there are, you know, three uses of force listed on this page, as I understand it.  The bottom one says "chemical agent" is the use of force.  Do you see that?

A    Yes.

Q    And do you see in the description of the use of force that the location was 106th and Washington?

A    Yes.

Q    Do you see in the description, third sentence, "Due to a blind" -- "blinding white light, numerous people on our line formation were unable to defend themselves from incoming projectiles"?

Craig Lehman

A    Yes.

Q    Okay.  And then the next sentence, "I located the source of the light, and I know from training and experience that blinding lights are a tactic they use to intentionally" -- "intentionally use to allow other violent agitators," and so on.  Do you see that sentence?

A    Yes.

Q    And then the middle sentence there says, "Got close enough to the suspect.  Deployed a one-to-two-second burst of pepper spray"?

A    Yes.

Q    Okay.  Does that sound like the incident that you described?

A    It does.

Q    Okay.  This is going -- I think there might be a typo in here that I -- I want you to help me clear up.  So can you go back to the first page of this Exhibit 9?  So you see at the top under "Officer" it says "Lehman"?

A    Yes.

Q    So is it your understanding that this is a force of -- use of force report -- a force data collection report that you -- you submitted?

A    I believe so.

Q    Okay.  Do you see the date?

Craig Lehman

A    Yes.

Q    So it looks like, based on some of the other entries here, that that's maybe, like, a drop-down menu --

A    Correct.

Q    -- that you fill out?  Okay.

Can you tell me what you meant by "active aggression" in this instance?

A    Yeah.  I think when the suspect is actively doing -- well, using the word again -- when the suspect is immediately taking an action that's causing a response by the officer, that would be active aggression.

Q    When you say "causing a response," what do you mean?

A    Well, in this instance, it would be squinting and trying to shield their eyes from the bright light.

Q    Okay.  And do you see under "Warning" there's a "Yes"?

A    Yes.

Q    Based on your recollection, do you -- do you recall providing a warning to Mr. Sitbon?

A    Not personally.

Q    Okay.  Do you recall another officer near you warning -- providing a warning to him?

Craig Lehman

A    No.

Q    Okay.  So when you wrote "warning" in here, can you tell me what you referred to?

A    Most of the warnings provided were delivered by a sound truck.

Q    Okay.  And the use of force is "chemical agent."  We agreed that that's pepper spray.  "Target Location" was at face -- was "face."  You said a one-to-two-second burst in his face; is that right?

A    Yes.

Q    Okay.  To your knowledge, did that one-to-two-second burst go anywhere other than Mr. Sitbon's face?

A    Not to my knowledge.

Q    Okay.  Do you know -- so when -- when pepper spray is deployed, do you know kind of the -- the spray range?  How -- like, how far does it go?

MR. MANLOVE:  I'll object as to vagueness.

THE WITNESS:  I don't know.  I couldn't estimate the distance.  I've never -- I've never tried to measure it.

BY MS. LAMB: (continuing)

Q    Okay.  If you pepper sprayed somebody that same distance that you pepper sprayed Mr. Sitbon in the face, would you expect that spray to go elsewhere, or

Craig Lehman

BY MS. LAMB: (continuing)

Q    Up -- I stopped it at 39:20.  Up to this point in the video, can -- can you describe what you were doing?

A    Well, I'm standing there, just holding a line, making sure that people don't go back down the street where they were all just moved from.

Q    Okay.  And can you -- based on this video, can you see approximately how many officers are standing near you in -- say, in the same line?

A    Like, from, like, corner to corner on the street?

Q    Say, from --

A    Like, how many --

Q    -- from the start of the crosswalk to this pole.

A    I couldn't estimate.  I -- no.  I -- I couldn't tell you.

Q    Okay.

A    Sorry.

        (Video played.)

BY MS. LAMB: (continuing)

Q    I'm going to pause it right here.  Can I get you to describe to me -- what do you hear on the video?

        MR. MANLOVE:  Where is it paused?

Craig Lehman

THE WITNESS:  I'm not sure what he's doing, but he's kind of bent over.

BY MS. LAMB: (continuing)

Q    Okay.  Does that appear to be, based -- I know you're some distance away, but does that appear to be the same individual that we saw in the orange in an earlier video?

A    I mean, based on clothing.

Q    Okay.  Okay.  I think that is it for this video.  So you noted in the -- Exhibit 16, when we watched the video, that you heard a couple of force warnings being issued, correct?

A    Yes.

Q    Okay.  Beyond those two force warnings that I pointed out, did you hear any other warnings of use of force?

A    From the video?

Q    Yes.

A    No.

Q    Okay.  Did you see any projectiles being thrown in that Fed Video?

A    Not that were shown in the video.

Q    Okay.  Okay.  Now that we have viewed those videos and I've pointed out Mr. Sitbon and what he was wearing -- earlier you said that you did not know

Craig Lehman

Q   Okay.  Looking at the video as a -- as a -- as a way to refresh your recollection, do you recall anything else about the nature of the crowd in the moment prior to using force?

A   No.

Q   Okay.  Based on what you saw on the video, how escalated would you say that crowd is?

A   I don't know.  It's -- I don't really have a scale for crowd escalation that I usually refer to.

Q   Did you see any illegal activity in that crowd on the video?

A   I wasn't looking too closely at what the majority of the crowd was.  I was mostly focusing on myself and being directed to look at Mr. Sitbon.

Q   Okay.  And did you see -- just to clarify, did you see any projectiles in either of those videos?

A   Not that were shown in the video.

Q   Okay.  You -- you saw lights shining from the crowd on both sides of the street, correct?

A   Yes.

Q   Okay.  Including Mr. Sitbon's light, presumably, correct?

A   Yes.

Q   Okay.  And you also saw in Mr. Sitbon and Ms. Des -- Desmond's video lights shining from the

Craig Lehman

police officers, right?

A    Yes.

Q    Okay.  Do you recall -- I asked you this earlier, but now that you've seen the video, do you recall Mr. Sitbon turning his light on and off -- or the bright light that you saw turning on and off?

A    Do I recall it from the moment I was there?

Q    Yes.

A    No.

Q    Okay.  Did -- did you see it turn on and off on the video?

A    I saw it illuminate and then not illuminate my face and the face of others.

Q    Okay.

A    I don't know if that was on or off, though.

Q    Okay.  And -- but you don't recall that -- you don't independently recall that from the evening?

A    No.

Q    Okay.  And had you experienced a bright light being shone at officers before?

A    Yes.

Q    Okay.  How frequent was that?

A    Depending on where you were, it could be more or less frequent.

Q    What do you mean "depending on where you

Craig Lehman

Okay.  So you -- you also talk about "vulnerable to other attacks," which is consistent with your testimony today, right?  But you also say, "It could cause serious protracted injury."  Can you tell me what you meant by that?

A    Yeah.  I think it's probably not healthy to stare at something really bright for a long period of time, kind of like you're not supposed to look at the sun.

Q    And how do you know that?

A    I don't know.  I'm not a doctor, but I just think over the course of my life and, you know, having been exposed to bright lights before, it doesn't feel good.  And, yeah, I mean, obviously, you know, like, when the -- we had the solar eclipse.  You know, you had to wear special glasses to look at the sun.  So, you know, I kind of rely on my past experience that way.

Q    Is it something you've been trained on?

A    Trained to not look at a bright light?

Q    Yes.

A    Not specifically.

Q    Okay.  Has it -- has it come up in any of your trainings on, like, threats that could be posed by protesters?

A    It -- it's been discussed after the fact, yes.

Craig Lehman

Q    What do you mean by "after the fact"?

A    After stuff like this happens, we discuss it and debrief it.

Q    Okay.  Is that at a training?

A    No.

Q    Okay.  So this is during a standard debriefing?

A    Correct.

Q    And do you discuss the potential injury that could be caused during the standard debriefing?

A    Not to that degree of spec -- specificity.

Q    Okay.  So in the video -- we saw quite a few lights shining around at the various videos.  Do you have a sense of how bright a light has to be before it poses a threat?

A    I couldn't tell you how many lumens it takes, no.

Q    Do you carry a flashlight as a patrol officer?

A    Yes.

Q    And is -- is it true that your police vehicle is equipped with lights?

A    Yes.

Q    My understanding is there's some lights kind of at the top?

A    Yes.

Craig Lehman

Q    That's called flood -- what's called floodlights?

A    Floodlights, alley lights, or takedown lights.

Q    Okay.  Those lights are pretty bright, right?

A    Yes.

Q    Okay.  What is the purpose of those lights?

A    To illuminate an area so we can see.

Q    Okay.  Have you ever shone your police car lights at -- at an individual, the floodlights?

A    Yes.

Q    Is -- is that considered a use of force?

A    No.

Q    Okay.  How about your flashlight?  Have you ever shone a flashlight at an individual?

A    Yes.

Q    Have you shone it at their face?

A    Yes.

Q    To the best of your knowledge, did you shine it in their eyes?

A    It's possible.

Q    And is that considered a use of force?

A    No.

Q    So you wouldn't fill out an FDCR because you shone -- shone a light at somebody, right?

A    No.

Craig Lehman

Q    Okay.  So based on -- based on what you saw in the video -- let me rephrase.  To the best of your recollection, was the use of pepper spray your only option during the incident?

A    No.

Q    What other options might you have had -- or did you have?

A    I mean, using my hands.

Q    What would that have entailed?

A    Taking the flashlight away from him.

Q    Why didn't you use that option?

A    Being outnumbered by a crowd, I don't think that would be the safest option to use, based on the totality of the circumstances.

Q    Let's dig -- I want to dig into the totality of the circumstances.  What specific -- what specifically made you think that was not the safest option?

A    Well, having -- being outnumbered is always dangerous when you're confronting a group of people. And I didn't really want to get into a tug-of-war over a piece of equipment and have -- be surrounded by a bunch of people.

Q    So when you were standing in the police line versus when you approached Mr. Sitbon to apply force,

Craig Lehman

at them.

BY MS. LAMB: (continuing)

**Q   Had you -- so you've seen bright lights being shone in other protests.  You testified to that, right?**

A   Yes.

**Q   Had you used force to prevent bright lights being shone in other protests?**

A   No.

**Q   Had you seized flashlights from protesters for the purposes of making them stop shining bright lights?**

A   Yes.

**Q   Okay.  Was not taking any action an option in this case?**

A   It's always an option.

**Q   What do you think -- I'm not going to ask you to speculate.  Why did you not consider that the best option in this case?**

A   I felt that the risk of allowing to be blinded by a light was greater than -- I felt it was riskier to allow -- allow somebody to continuously blind us with a light than to do nothing.  So I thought taking action to prevent the blinding light was better than doing nothing.

**Q   Was there an option to ask Mr. Sitbon to turn off his light?**

Craig Lehman

A    I don't believe so.

Q    **Why not?**

A    I think, based on the context of the situation, that was not going to be a situation where there was going to be a fruitful negotiation to stop doing something.

Q    **What do you mean by "the context of the situation"?**

A    It was a protest where people had to be physically moved out of a street in front of a precinct that was previously trying to be lit on fire.

Q    **And you said you don't think that would have been a fruitful discussion.  What do you mean by "fruitful"?**

A    Productive.

Q    **What do you mean by "productive"?**

A    I don't think he would have complied.

Q    **Okay.  So we've talked about this for a while, and you've viewed the video.  Do you believe your use of force again Mr. Sitbon was within PPB policy?**

A    Yes.

Q    **Okay.  Has your opinion on that changed over time?**

A    No.

Q    **I want to go back to Exhibit 3, which is 1010.**

Craig Lehman

Q    Is it a crime -- or is a crime an offense?

A    It can be.

Q    Can an action that is not a crime be an offense?

A    I suppose.

Q    And in this case, what was the offense?

A    The offense was the active aggression by shining a light in our face.

Q    Any of these other five apply to this case?

A    Yeah.  2.1.4, "Defend the member or another person from the use of physical force."

Q    And the member or other person you were defending in this case would -- would have been your fellow officers?

A    Yes.

Q    And the use of physical -- what was the use of physical force?

A    The physical force was the light coming from the flashlight.

Q    Now let's look at 3.1, which is the bottom of the same page.  You testified earlier, having watched the videos, you did not hear a warning other than the sound truck warnings in those videos, correct?

A    Correct.

Q    And to the best of your recollection, there

Craig Lehman

you -- have you ever been disciplined at any other job?

A    Not that I can remember.

Q    Have you ever been fired from another job?

A    No.

Q    Okay.  When you were at the Beaverton Police Department, do you recall receiving any discipline there?

A    No.

Q    Okay.  And how about since 2012, since you've been at PPB, have you been disciplined?

A    Yes.

Q    Do you -- do you recall how many times?

A    No.

Q    Multiple?

A    Like, more than one?

Q    Yes.

A    Yes.

Q    Okay.  What is the highest level of discipline you've received?

A    A suspension.

Q    How long was the suspension?

A    One workday.

Q    Do you recall what that was for?

A    Yes.

Q    What was it for?

Craig Lehman

A    Use of force.

Q    Was that excessive use of force?

A    I don't know how they labeled it.

Q    So your -- my understanding of how it works is, there are allegations.  Those allegations are investigated, and then there are findings for the allegations.  They're sustained, exonerated, et cetera.  And so the -- a sustained findings could result in discipline.  Is that your understanding as well?

A    Yes.

Q    So the alleg -- I'm asking about the allegation itself.  Was the allegation excessive use of force?  Do you recall?

A    I don't know.  I don't remember what the allegation was.

Q    Okay.  Do you remember the incident?

A    Yes.

Q    What was the incident?

A    It was a protest incident.

Q    Can you tell me what the alleged excessive use of force was?

            MR. MANLOVE:  Objection.  Mischaracterizing his testimony.

BY MS. LAMB: (continuing)

Q    Can you tell me -- I'll rephrase it.  Can you

Craig Lehman

You can answer.

THE WITNESS:  No.

BY MS. LAMB: (continuing)

Q    Do you recall thinking -- do you recall whether or not you thought any of your actions in this incident violated policy?

A    No.

Q    You don't recall, or -- or you didn't think so?

A    I didn't think so.

Q    Now that you've been reminded what this investigation was about, do you remember which specific allegation you were sustained on?

A    Number 4 on the allegations.

Q    Do you remember why that was sustained or the explanation given to you?

A    I do not remember the explanation, no.

Q    Do you remember what the -- what the -- actually, you know what?  Let's -- let's look at the -- the transcript.  That's going to be Exhibit 20.

(Exhibit No. 20 marked.)

BY MS. LAMB: (continuing)

Q    This is a transcript in the same case, Case 2020-C-0088.  This was -- this is a transcript of the interview that you did with -- I believe this is

Craig Lehman

there.

Q   Okay.  Does that match your recollection or...

A   Yes.

Q   You don't -- so you don't recall receiving the specific letter, but you recall receiving a letter of reprimand?

A   Correct.

Q   Okay.  And what do you recall about receiving this discipline?

MS. O'KASEY:  Object to the form of the question.

You can answer.

MR. MANLOVE:  City joins.

THE WITNESS:  I don't know.  I'm not sure that -- sure what you're asking.

BY MS. LAMB: (continuing)

Q   Okay.  So you -- you don't recall receiving the letter.  Do you recall having a meeting with anybody about the letter?

A   Yeah.  I mean, it was given to me by somebody.

Q   Do you recall who you met with?

A   No.

Q   Do you recall, was there any discussion about it?

A   I don't remember.

Craig Lehman

Q    Do you recall ever meeting with your supervisor to discuss this?

A    I don't remember.

Q    Let me ask a clarifying question.  Do you have -- do you have one supervisor?  Do you have, like, a direct supervisor, or do you have many people that you report to?

A    We have many.

MR. MANLOVE:  Objection.  Vagueness.  What time are you talking about?  Are you talking about the time of this letter?  Are you talking in general?

MS. LAMB:  I'm talking in general.

MR. MANLOVE:  All right.

BY MS. LAMB: (continuing)

Q    What was your answer?

A    I have multiple supervisors.

Q    Do you have one individual that's, say, responsible for your performance evaluation?

A    Yes.

Q    Do you have an individual that's responsible for communicating, maybe, discipline?

A    No.

Q    How many supervisors do you have generally?

A    I mean, there's usually one assigned for each set of days off.  So there would be seven sets of days

Craig Lehman

A    Yes.

Q    What -- what -- based on your recollection, what was sustained?

A    It was the pepper spray.

Q    Why was that sustained?  Or what -- what were you told about why that was sustained?

A    I don't remember.

Q    So you -- you don't remember what about your use of pepper spray was deemed out of policy?

A    No.

Q    Do you recall how you were disciplined in this case?

A    Yes.

Q    How?

A    Suspension.

Q    Was that the one-day?

A    Yes.

Q    Okay.  Do you recall how you -- how you learned about that?

A    No.

Q    Okay.  Do you recall whether or not you had a meeting to discuss your suspension?

A    I do not recall the meeting.

Q    Do you recall whether or not there was a meeting?

Craig Lehman

A    I believe there was a meeting.

Q    Okay.  But you don't recall the specifics of the meeting?

A    Correct.

Q    And do you recall who the meeting was with?

A    No.

Q    Do you recall discussing either the incident or the discipline with a supervisor?

A    No.

Q    Do you recall receiving any training after the incident?

A    No.

Q    After the sustained finding?

A    No.

Q    Do you recall receiving any coaching?

A    No.

Q    Do you recall any conversation about what to do differently in the future?

A    No.

Q    Did the sustained finding change anything about how you approach your work?

A    No.

Q    Okay.  If the same situation were to arise again, would you do anything differently?

MS. O'KASEY:  Object to the form of the

Craig Lehman

question.

You can answer.

MR. MANLOVE:  City joins.

THE WITNESS:  No.

BY MS. LAMB: (continuing)

Q    Okay.  We're going to do this one more time. Let's go back to -- I think it's Exhibit 19 -- nope -- Exhibit 17.  Now we're going to look at 2020-C-280.  I believe that's on the second page.  It's one up from the one we just looked at.  So do -- do you see that one?

A    Yes.

Q    Okay.  The complainant was David Bowen.  Just based on the case number and the name, do you have any recollection of this case?

A    Yes.

Q    Can you remember the incident?

A    Yes.

Q    Can you tell us what happened?

A    Yeah.  It was a -- during a riot.  We had a sound truck giving multiple warnings to clear an -- an intersection from people that were throwing fireworks and rocks and other projectiles at us.  People weren't leaving, and we had to push -- make several attempts to move a crowd back.  And then after a while, I spotted Mr. Bowen.  And as he was walking away, I pushed him to

Craig Lehman

get out of the area.

Q    Do you recall why you pushed him?

A    Yeah.  I wanted him to leave the area faster.

Q    Do you recall which direction he was moving? Meaning, was he moving toward the direction that he was ordered to disperse to or -- or not?

A    I believe so.

Q    You believe he was moving which -- which -- what do you believe?

A    I believe he was moving towards the direction.

Q    That he was ordered to disperse to?

A    I believe so.

Q    So why -- why did you shove him?

A    He had done the same pattern multiple times. He would linger in the area after he got the warning to leave, and he wouldn't leave or he would at least feign as if he was leaving and just kind of slow walk and saunter away.  So finally I just wanted to make sure that he was getting out of the area quicker, so I pushed him.

Q    Okay.  And it looks like there were two sustained allegations in this case, one on conduct and one on force.  Do you -- do you recall those allegations?

A    Yes.

Craig Lehman

BY MS. LAMB: (continuing)

Q    Okay.  Let's -- let's look at the transcript. This is going to be Exhibit 27 in your binder.  And specifically we're going to look at line 202, which is page 5 of 7, Bates No. 4493.  Actually, let's move down a little bit.  I want to look at line 212.  You say there that, "Threat-wise, I mean, I would say he was engaging in physical resistance."  Is that -- do you recall saying something like that?

A    Yeah.

Q    Okay.  What physical resistance did you see from him?

A    I mean, not complying with the first three or however many times we told him to leave the area.  I mean, that's physical resistance.

Q    You -- you seem to have a pretty good memory of this particular case.  Is there any reason this one stands out to you?

A    It's been talked a lot about.

Q    By whom?

A    Internal affairs, command staff, chief.

Q    Okay.  And were you a part of those conversations?

A    Yes.

Q    Okay.  When did those conversations take

Craig Lehman

A    Yeah.  President.

Q    Okay.

A    Union president.

Q    Do you recall discussing the findings or the incident with a supervisor?

A    No.

Q    Command staff?

A    Yes.

Q    Who?

A    Commander Dobson.

Q    What was the nature of that conversation?

A    I mean, it wasn't even -- really even a conversation.  He just presented me the actual findings in written form.

Q    Do you recall the -- did you receive discipline?

A    No.

Q    Do you know -- do you know why there was no discipline in this case?

A    No.

Q    Kind of going back to the same questions, do you recall any conversation with a supervisor or a member of the command staff about why these allegations were sustained against you?

A    Yes.

Craig Lehman

Q    And was that the conversation with Commander Dobson?

A    No.

Q    Who else did you talk to about that?

A    Chief Day.

Q    So this must have been relatively recent?

A    Yes.

Q    In the last -- within the last year?

A    Yes.

Q    And what was the purpose of that conversation?

A    To -- it was a predetermination meeting to basically decide what discipline I might be facing.

Q    But ultimately you were not disciplined, right?

A    I have not been disciplined.

Q    Is this case -- is it still pending?  Do you know?

A    Yes.

Q    Oh, okay.  I was not aware of that.

Okay.  At any point, have you received any training to address the issues in this case?

A    No.

Q    Any coaching?

A    No.

Q    Any discussion on what to do differently next

Craig Lehman

time?

    A    Yes.

    Q    With whom?

    A    Chief Day.

    Q    It was at that same predetermination meeting?

    A    Yes.

    Q    And, briefly, what did -- what did he say to do differently?

    A    He didn't say what to do differently.  It was just more of a conversation about totality of circumstances and, you know, my thoughts on the event in its entirety.

    Q    So was he asking for your perspective in that -- in that conversation?

    A    Yes.

    Q    On what you -- how you assessed the total -- totality of circumstances?

    A    Yes.

    Q    Okay.  Did he offer any thoughts on your assessment?  Like, did he give an opinion?

    A    Not that I can remember.

    Q    Given that this is still pending, if you were to encounter the same situation again, would you do anything differently?

            MS. O'KASEY:  Object to the form of the

Craig Lehman

section I just want to revisit really quickly.  Then I will give you all the opportunity to ask questions.

(Exhibit No. 18 marked.)

BY MS. LAMB: (continuing)

Q    Can we look at Exhibit No. 18?  Have you ever seen this document before?

A    I don't remember this document.  I was just reading the --

Q    Sure.

A    -- notes.

Q    Okay.  Are you familiar with the Employee Information System or EIS?

A    Yes.

Q    Okay.  Do you know what that is?

A    Yes.

Q    What is it?

A    It's a performance discussion tracker.

Q    Okay.  And it says at the top this is the supervisor performance discussion tracker?

A    Yeah.

Q    You see your name on there as well?

A    Yeah.

Q    Okay.  Do you -- my understanding of -- of the EIS is it also tracks use of force, in terms of the number of uses of force.  Is that your understanding --

Craig Lehman

A    Yes.

Q    -- as well?

Okay.  Have you ever had a conversation with a supervisor or a member of the command staff over the number of uses of forces for yourself?

A    Yes.

Q    Can you recall -- how many times have you had a conversation like that?

A    I can't recall the number of times.

Q    More than once?

A    Maybe.

Q    What is -- what -- based on -- to the best of your recollection, what did that conversation or those conversations entail?

A    Normally, it's not about the number of uses of forces.  It's about the ratio.

Q    Okay.

A    Yeah.  The amount of forces you have to the amount of arrests you make.

Q    And did you have the convers -- why did you have a conversation around EIS?

A    It's -- there's certain benchmarks.  I don't know who determines what they are or why, but if you exceed a certain benchmark in the system, it automatically triggers a conversation to be had about

Craig Lehman

whatever the -- whatever the issue is.  It could be traumatic incidents or use of force or anything.

Q    And you recall having at least one conversation that was triggered by EIS?

A    Yes.

Q    Do you recall what the trigger was?

A    Yes.

Q    What was it?

A    Force ratio.

Q    Okay.  And when you say "force ratio," does that mean that the ratio of uses of force to arrests is higher than some benchmark?

A    Yeah.  It's a percent.  And I don't know what the benchmark is.

Q    That's okay.

A    But yes.

Q    Okay.  And do you recall who that conversation was with?

A    Well, the last one was recent.

Q    Who was that one with?

A    Sergeant Hefley.

Q    When, approximately, was that?

A    Last week.

Q    Oh, okay.  Very recent.

A    Yeah.

Craig Lehman

Q    Did -- other than that conversation, have you had a similar conversation in the last year, say?

A    I don't think so.

Q    Do you recall whether or not you had that kind of conversation in 2020?

A    I don't remember.

Q    Based on the conversation that you had most recently, can you tell me a little bit about what -- what goes on in that meeting?

A    Basically, it's just to -- it's a really brief conversation.  It's just, "Hey, this is" -- "I got an alert that this says your force ratio is this, based on how many arrests and how many force incidents you've had.  Do you" -- "Is everything, like, going okay?  Do you need any resources?"  And -- and then, basically, that's it.

Q    Do you get into any of the individual uses of force in that meeting?

A    Sometimes.

Q    Why -- why would you get into an individual use of force?

A    Oh, well, I mean, specifically with the conversation with Sergeant Hefley, he said, "I reviewed the" -- this was -- it was, like, two uses of forces.  And he reviewed them both, and he said, "They're both

Craig Lehman

low-level uses of forces."  He's like, "I'm not concerned."

Q    Okay.

A    And that was that.

Q    Do you recall ever having a conversation around EIS where whoever you were having the conversation with expressed any concerns about your uses of force?

A    No.

Q    Do you recall any of the conversations around EIS, including any corrective action or suggestions on how to change your practices?

A    Not that I can remember.

Q    Would you characterize any of the conversations as disciplinary in nature?

A    No.

Q    Would you characterize any of the conversations as coaching?

A    No.

Q    Okay.  I think that's all the questions that I have.  So I will ask you if you -- do you -- is there anything you want to clarify that we've discussed today?

A    I don't think so.

        MS. LAMB:  Okay.

        MS. O'KASEY:  I have no questions.

**Craig Lehman**

CERTIFICATE

I, Kimberly M. Harrison, an Oregon Certified Shorthand Reporter, a Washington Certified Court Reporter, and a Registered Professional Reporter, hereby certify that CRAIG LEHMAN personally appeared before me at the time and place set forth in the caption hereof; that at said time and place, I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 224, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand and CSR seal at Portland, Oregon, this 11th day of March, 2024.



_____

Kimberly M. Harrison

Oregon CSR No. 12-0423

Expires 9/30/2026

Washington CCR No. 3287

Expires 7/13/2024

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PHILLIP SITBON,                    )
                                   )
                    Plaintiff,     )
     v.                            )
                                   )  Case No.
CITY OF PORTLAND, PORTLAND         )
POLICE BUREAU OFFICER CRAIG        )  3:22-cv-01148-SI
LEHMAN, and JOHN DOES 1-10         )
                                   )
                    Defendants.    )
                                   )
                                   )


VIDEO-RECORDED DEPOSITION OF CARISSA LYNN DESMOND

Taken on Behalf of Defendants

* * *


BE IT REMEMBERED THAT, pursuant to the Federal Rules of Civil Procedure, the deposition of CARISSA LYNN DESMOND was taken before Bailey K. Fierling, a a Certified Shorthand Reporter, on Monday, the 24th day of June, 2024, commencing at the hour of 10:00 a.m., in the offices of 1221 SW 4th Ave, Suite 430, Portland, Oregon.

* * *

APPEARANCES

OREGON JUSTICE RESOURCE CENTER
     BY MR. JONATHAN GERSTEN
     511 SW 10th Ave
     Floor 4
     Portland, OR 97205
     jgersten@ojrc.info
     Attorney for Plaintiff;

CITY ATTORNEY'S OFFICE
     BY MR. WILLIAM W. MANLOVE, III
     1221 SW 4th Ave,
     Suite 430
     Portland, OR 97204
     503-823-4047
     william.manlove@portlandoregon.gov
     Attorney for Defendant City of Portland;


HART WAGNER
     BY MR. TAYLOR B. LEWIS
     1000 SW Broadway
     20th Floor
     Portland, OR 97205
     503-222-4499
     Tbl@hartwagner.com
     Attorney for Defendant Officer Craig Lehman.


Joe Walsh, Videographer

A.    Yes.

Q.    And he says something to the effect, seriously, as soon as I turn on mine, they turn on theirs.  Something to that effect; correct?

A.    Correct.

Q.    So here we've stopped it, and you can see there's -- it's depicted at 21 seconds.  There's two lights there seen in this -- at this moment on the clip; correct?

A.    Yes.

Q.    And there's one to the left and then one to the right.  Do you -- do you remember -- do you remember -- do you remember independently, or has this video refreshed your memory about whether or not the police would shine -- appear to shine lights at Phillip after Phillip would shine lights at them?

A.    I -- I don't know if that was always the case.  But in this specific clip, that's what happened.  But I know that Phillip would get mad about the cops shining bright lights on us, and then they also didn't like that.  So I don't know if it was always him first and then them second or not, but in this specific clip, that is the case.

Q.    That is the case, meaning Phillip shined his light first and then the police shined their

12:08:27

12:08:42

12:09:06

12:09:30

12:09:48

lights?

A.   At that instant, yeah.

Q.   Yeah.  Because at this 21 seconds -- because that seems to be what Mr. Sitbon is saying; correct?

12:09:58

A.   Right.

Q.   And do we know -- I mean, is it your belief in watching the video and from your memory that these lights that we see, those are lights from -- from the police or law enforcement?

12:10:07

A.   Yes.

Q.   Why do you have that belief?

A.   Because they're the ones that are standing right there.  But it's hard to see what their flashlights ever really look like because their lights are so bright that you can't really see in the area where they're shining from.

12:10:19

Q.   Okay.  All right.  I'm going to continue playing Exhibit 11.

(Video playing.)

12:10:34

Q.   BY MR. MANLOVE, III:  So I've stopped it at 28 seconds.

A.   Yeah.  It's hard to tell exactly where that's coming from.

Q.   Okay.  This image we see -- we -- the

12:10:47

video seems to depict at this 28 seconds on

Exhibit 11, in terms of -- of the illumination, it

seems like there's a wall in the background that

seems to be illuminated.  And then also a police

officer.  His face seems to be illuminated.  Would          12:11:13

you agree with that?

    A.   Yes.

    Q.   Is it your understanding that that

illumination that we see at 28 seconds, that that's

coming from Mr. Sitbon's flashlight?                         12:11:25

           MR. GERSTEN:  Object to form.  Calls

for speculation.

           But you can answer.

    A.   I don't know.  It could have been my

camera lights, because it doesn't look like it's            12:11:37

that sort of a light there, but it's hard to tell.

But the one -- the -- that, like, circle right there

looks like it's flashing this way though, so...

    Q.   BY MR. MANLOVE, III:  By the circle, you

mean the lights?                                            12:11:51

    A.   Yeah.

    Q.   Yeah.  That's obviously coming towards --

    A.   Coming from that way.  But there's

definitely some type of light from that officer.

But I had a lot on my camera, as well.  So this             12:12:00

CERTIFICATE

I, Bailey K. Fierling, a Professional Court Reporter, hereby certify that said witness personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in Stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and that the foregoing pages constitutes a full, true and accurate record of all such testimony adduced and oral proceedings had and of the whole thereof.

I further certify that review of the transcript was not requested.

Witness my hand at Portland, Oregon, this 2nd day of July, 2024.

_____
Bailey K. Fierling
OR CSR No. 230125
Expires: 12/31/26
WA CCR No. 22021000
Expires: 8/10/24

**Ross Caldwell**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

PHILLIP SITBON,

       Plaintiff,

  vs.                       No. 3:22-cv-00148-SI

CITY OF PORTLAND, PORTLAND

POLICE BUREAU, OFFICER CRAIG

LEHMAN, and JOHN DOES 1-10,

       Defendants.

DEPOSITION OF ROSS CALDWELL

Taken in behalf of the Plaintiff

Thursday, May 30, 2024

BE IT REMEMBERED THAT, pursuant to the Civil Rules of Procedure, the deposition of ROSS CALDWELL, was taken before Chris E. Roemmich, a Notary Public for the State of Oregon, on Thursday, May 30, 2024; commencing at the hour of 9:29 a.m.; the proceedings being reported at Portland Office of City Attorney, 1221 SW 4th Avenue, 1st Floor Conference Room, Portland, Oregon 97204.

Ross Caldwell

APPEARANCES


Appearing on behalf of the Plaintiff:

JONATHAN GERSTEN

OREGON JUSTICE RESOURCE CENTER

P.O. Box 5248

Portland, OR  97208

(503) 944-2270

Jgersten@ojrc.info


Appearing on behalf of the City of Portland and

Portland Police Bureau:

WILLIAM MANLOVE

PORTLAND OFFICE OF CITY ATTORNEY

1221 SW 4th Avenue

Suite 430

Portland, OR  97204

(503) 823-4047

William.manlove@portlandoregon.gov

**Ross Caldwell**

APPEARANCES (continued)


Appearing on behalf of Officer Craig Lehman:

TAYLOR LEWIS

HART WAGNER

1000 SW Broadway

Suite 2000

Portland, OR  97205

(503) 222-4499

Tbl@hartwagner.com

Ross Caldwell

courtesy directive is or something like that, so that's a big part of what our investigators do is they take it -- they take in the complaint and they interview the complainant, get all the information they can from them and then try to translate that into, you know, what are the specific allegations, because that's what you need to be able to prove is -- you know, in order for an allegation to be sustained, you have to prove that this directive was violated, so part of that is taking the information from the complainant and the other part of that is identifying what the directive would be, and then you kind of, you know, have your investigative strategy from there.

**Q.   Separate and distinct from the directives could there be an allegation written up purely or inclusive of the directives, but could there be an allegation written up for unconstitutional conduct specifically?**

          MR. MANLOVE:  Objection.  Compound.

BY MR. GERSTEN:

**Q.   So I'll rephrase that.  Can there be an allegation of unconstitutional conduct for a Portland police officer?**

     A.   People's constitutional rights and, you know, the rules for police about respecting those rights

Ross Caldwell

would all be baked into the directives, and so we're not going to write an allegation that says, you know, Officer Jones used inappropriate force on Mr. Smith and then cite the constitution.  We're going to cite the police bureau's directive 1010, because what the ultimate decision maker on this, you know, when they review the investigation report and the various findings recommendations, they're not comparing the behavior to the constitution.  They're comparing the behavior to the directive.

Q.   Okay.

A.   And the directives are much more specific, I assure you.  I've read them.  They're very long.  The force directive is 26 pages or maybe longer.

Q.   Yeah.  So in 2020, who -- who conducted that first line intake investigation?

A.   Our investigators would do that.

Q.   Okay.

A.   Yeah.

Q.   How long prior to 2020, the protests of 2020 -- how long did an investigation take?

A.   It just depends.

MR. MANLOVE:  Hang on.  Hang on.  Objection.  Vagueness.

BY MR. GERSTEN:

Ross Caldwell

REPORTER'S CERTIFICATE

I, Chris Roemmich, a professional court reporter, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS HEREOF, I have hereunto subscribed my name this 13th day of June, 2024.



_____

Chris Roemmich

Oregon Commission No. 1021058

Expires 01/19/2026

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

PHILLIP SITBON,

     Plaintiff,

  vs.                  No. 3:22-cv-00148-SI

CITY OF PORTLAND, PORTLAND

POLICE BUREAU, OFFICER CRAIG

LEHMAN, and JOHN DOES 1-10,

     Defendants.

DEPOSITION OF DETECTIVE ERIK KAMMERER

Taken in behalf of the Plaintiff

Thursday, May 23, 2024

BE IT REMEMBERED THAT, pursuant to the Civil Rules of Procedure, the deposition of DETECTIVE ERIK KAMMERER, was taken before Chris E. Roemmich, a Notary Public for the State of Oregon, on Thursday, May 23, 2024; commencing at the hour of 9:37 a.m.; the proceedings being reported at Hart Wagner, 1000 SW Broadway, Suite 2000, Portland, Oregon 97205.

**Page 2**

**Detective Erik Kammerer**

APPEARANCES


Appearing on behalf of the Plaintiff:

FRANZ BRUGGEMEIER

AMANDA LAMB - (Via Zoom)

OREGON JUSTICE RESOURCE CENTER

P.O. Box 5248

Portland, OR  97208

(503) 944-2270

Fbruggemeier@ojrc.info

Alamb@ojrc.info


Appearing on behalf of the City of Portland and

Portland Police Bureau:

WILLIAM MANLOVE

PORTLAND OFFICE OF CITY ATTORNEY

1221 SW 4th Avenue

Suite 430

Portland, OR  97204

(503) 823-4047

William.manlove@portlandoregon.gov

**Detective Erik Kammerer**

APPEARANCES (continued)


Appearing on behalf of Officer Craig Lehman:

KAREN O'KASEY

HART WAGNER

1000 SW Broadway

Suite 2000

Portland, OR  97205

(503) 222-4499

Kok@hartwagner.com

Detective Erik Kammerer

force unlawfully?

MR. MANLOVE:  Objection to the extent it calls for speculation.

MS. O'KASEY:  Yeah.  Object to the form of the question.  You can answer.

THE WITNESS:  I think members of the public felt that that was the case based on things that were being said.

BY MR. BRUGGEMEIER:

Q.   Did you believe that members of RRT were using force in an unlawful way?

A.   No.

Q.   Not one instance?

A.   I never saw a single instance of members of RRT using force inappropriately.

Q.   About how many days or nights --

Let me start over.  About how many protests did you attend in 2020 as a member of RRT?

A.   I don't know the exact number.  Most of them.

Q.   Most of the over 100 protests; is that correct?

A.   I would say that's probably accurate.

Q.   Okay.  In all of those protests, what was your role with RRT?

A.   For the summer of 2020, my role was to be a

Detective Erik Kammerer

REPORTER'S CERTIFICATE

I, Chris Roemmich, a professional court reporter, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS HEREOF, I have hereunto subscribed my name this 8th day of June, 2024.

*Chris E. Roemmich*
_____

Chris Roemmich

Oregon Commission No. 1021058

Expires 01/19/2026

DISORDERLY CONDUCT

## Portland Police Bureau
### GOVERNMENT AGENCY RELEASE

CASE NUMBER
GO 42 2020-681016

IMAGE ATTACHMENT (4000171)   OFC LEHMAN

## *Force Data Collection Report*                    Page 1 of 5

CASE # `2020` - `681016`   OFFICER `Lehman`   DPSST `51073`   ☐ AMENDED

DATE `20` / `06` / `2020`   TIME: `approximatley 2200 hours`   ASSIGNMENT: `RRT`

LOCATION `737 SE 106th Ave and surrounding area`

NAME (LAST, FIRST M) `Unknown`   GENDER   RACE   DATE OF BIRTH `M M / D D / Y Y Y Y`

### TYPE OF CALL - REASON FOR CONTACT

☐ SUBJECT STOP   ☒ PERSON CRIME   ☒ PROPERTY CRIME   ☐ ADMINISTRATIVE   ☐ INJURED ANIMAL
☐ TRAFFIC STOP   ☒ OTHER   ☐ MERE CONVERSATION   ☐ WELFARE CHECK   DOMESTIC RELATED? `NO`

EXPLAIN

On this date and time I was working as a member of the Rapid Response Team, on Delta squad, and we were tasked with responding to a civil disturbance for multiple days in a row. Criminal agitators were blocking traffic, committing, acts of vandalism, and throwing projectiles at officers throughout the incident. This event was one of many that I have previously responded to over the past month, and many of these events devolved into riots where a police response was necessary to quell the violence and property damage.

### LEGAL AUTHORITY FOR CONTACT

☐ REASONABLE SUSPICION   ☐ WARRANT/JUDICIAL DECREE   ☐ OTHER
☒ PROBABLE CAUSE   ☐ CIVIL HOLD   ☒ CIVIL UNREST

EXPLAIN

Almost immediately after the mob of over 100 people descended upon East Precinct, acts of vandalism, arson, and assaults began to occur. We heard over the radio that an elderly woman had been assaulted by criminals within the crowd. These criminals had thrown paint on the elderly woman as she attempted to deescalate the crowd and prevent them from causing violence and destruction aimed at the building. Another elderly woman attempted to put out a fire in a trash can and another criminal agitator attempt to stop by pushing her arm away when she attempted to extinguish the flames with a fire extinguisher.

All of these actions were done despite no police officers being visually present to the violent mob of criminals.

### CONDITION PRIOR TO FORCE

☒ ARMED (ACTUALLY)   ☐ MENTAL HEALTH INFLUENCE (PERCEIVED)   ☐ PASSIVE RESISTANCE*
☐ REPORTED TO BE ARMED   ☐ UNDER THE INFLUENCE OF DRUGS   ☒ ENGAGED IN PHYSICAL RESISTANCE
☐ ARMED (PERCEIVED)   ☐ UNDER THE INFLUENCE OF ALCOHOL   ☐ OTHER   ☐ NONE

EXPLAIN

This violent crowd was actively committing assaults against police officers, via dangerous projectiles. The violent crowd had already been given orders to disperse, with clear directions to go and a reasonable amount of time to satisfy our instructions. The majority of the crowd did not follow the instructions to leave the area and instead became more hostile.

We had made several attempts to move the crowd away from our precinct, and when we tried this tactic we were met with a barrage of hard projectiles from the crowd.

### PERCEIVED CONDITION FOR LACK OF COMPLIANCE PRIOR TO FORCE

☐ MEDICAL CONDITIONS   ☐ DEVELOPMENTAL DISABILITY   ☒ DISOBEDIENT / ANTAGONISTIC   ☐ OTHER
☐ MENTAL IMPAIRMENT   ☐ MENTAL HEALTH CRISIS   ☐ LANGUAGE BARRIER   ☐ PHYSICAL LIMITATIONS
☐ IMPAIRED FROM DRUGS OR ALCOHOL OR BOTH

EXPLAIN

his crowd was made up of people that were largely hostile towards the police and appeared to come down to this area to engage in a violent confrontation with law enforcement, as they had done so on multiple previous nights. Since this group, and other groups, have been given significant leeway regarding minor offenses while protesting, my only belief is that this group had no intention of conveying a message, but rather was intent on violence and destruction. This group, and individuals within, clearly had not intention of

USE OF FORCE 04.26.20

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER          SITBON_CITY_002432
Exhibit 1 to Declaration of Juan Chavez-Page 1 of 5

DISORDERLY CONDUCT

## Portland Police Bureau
### GOVERNMENT AGENCY RELEASE

**CASE NUMBER**
GO 42 2020-681016

---

### *Force Data Collection Report*  Page 2 of 5

| CASE # | 2 | 0 | 2 | 0 | - | 6 | 8 | 1 | 0 | 1 | 6 | OFFICER | Lehman | DPSST | 5 | 1 | 0 | 7 | 3 | ☐ AMENDED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

conveying a message or protesting peacefully, but were rather intent on engaging in a violent insurrection.

Based on the dialogue and rhetoric I was hearing from the crowd, the majority seemed to condone the destruction of government property, arson, and violence against police. Many of the crowd taunted us and bragged about throwing rocks at police and causing injuries to us.

### MENTAL HEALTH

☒ NONE        ☐ PRIOR TO FORCE KNOWLEDGE        ☐ POST FORCE KNOWLEDGE        ☐ OTHER

**EXPLAIN**

I did not perceive anyone in the crowd to be suffering from any mental health issues.

### SPECIALTY UNITS

YES, WHICH ONES?    SPECIALTY UNITS INVOLVED?

**WHICH SPECIALTY UNITS?**

RRT, ECIT, SERT

### DE-ESCALATION TECHNIQUES

YES        DE-ESCALATION TECHNIQUES WERE ATTEMPTED OR USED?

**EXPLAIN WHY NO DE-ESCALATION TECHNIQUES WERE USED/ATTEMPTED OR DESCRIBE TECHNIQUES USED/ATTEMPTED**

RRT used numerical superiority to discourage the need for force to be used. We used time and distance to allow protesters to an opportunity to comply with our directions. I

### USE OF FORCE WAS NECESSARY TO

☒ PREVENT OR TERMINATE THE COMMISSION OF AN OFFENSE.

☐ LAWFULLY TAKE A PERSON INTO CUSTODY, MAKE AN ARREST, OR PREVENT AN ESCAPE.

☐ PREVENT A SUICIDE OR SERIOUS SELF-INFLICTED INJURY.

☒ DEFEND THE MEMBER OR OTHER PERSON FROM THE USE OF PHYSICAL FORCE.

☒ ACCOMPLISH SOME OFFICIAL PURPOSE OR DUTY THAT IS AUTHORIZED BY LAW OR JUDICIAL DECREE.

### CHRONOLOGICAL USE OF FORCE

| | RESISTANCE | WARNING | FORCE | TARGET LOCATION | RESISTANCE CONTINUED | RE-EVALUATE |
|---|---|---|---|---|---|---|
| + / - | ACTIVE AGGRESS | YES | LAUNCHABLE IMPACT | LEFT LEG | NO, EXPLAIN | YES |

| IMPACT ROUNDS | DEPLOYMENT | DISTANCE | |
|---|---|---|---|
| MARKING | LAUNCHABLE | Approximately 50 feet | |

**DESCRIBE THIS USE OF FORCE:**

The soundtruck gave force warning including the use of impact munitions.  As we were attempting to leave the area I was standing on the back rail of our vehicle when I observed a suspect begin throwing a hard projectile at us as we were attempting to leave the area on our vehicle. As I have stated before in previous reports, and having experienced this behavior on multiple occasions, I know that it is extremely dangerous to throw projectiles at defenseless officers as they are attempting to escape on a vehicle that is quickly trying to leave the area.

Due to this suspect active aggression that was displayed when he attempted to assault officers with a projectile, I deployed one 40mm impact round targeting the suspects belt line. My round missed the suspect and appeared to fall short due to our increasing distance away from the suspect.

USE OF FORCE 04.26.20

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER        SITBON_CITY_002433
Exhibit 1 to Declaration of Juan Chavez-Page 2 of 5

DISORDERLY CONDUCT

**Portland Police Bureau**
GOVERNMENT AGENCY RELEASE

CASE NUMBER
GO 42 2020-681016

## Force Data Collection Report

Page 3 of 5

CASE # 2 0 2 0 - 6 8 1 0 1 6   OFFICER Lehman   DPSST 5 1 0 7 3   ☐ AMENDED

| | RESISTANCE | WARNING | FORCE | TARGET LOCATION | RESISTANCE CONTINUED | RE-EVALUATE |
|---|---|---|---|---|---|---|
| +  - | ACTIVE AGGRESS | YES | LAUNCHABLE IMPACT | RIGHT LEG | NO, EXPLAIN | YES |

| IMPACT ROUNDS | DEPLOYMENT | DISTANCE | |
|---|---|---|---|
| MARKING | LAUNCHABLE | approximately 30 feet | |

**DESCRIBE THIS USE OF FORCE:**

The soundtruck gave force warning including the use of ompact munitions.. After observing another criminal begin to throw a projectile directed at officers in the parking lot near Target, I fired one 40mm impact round at the suspect right leg. This round also missed, but the suspect was scared nevertheless and ran away, not to be seen again.

This use of force was in response to active aggression by a violent criminal attempting to assault police officers with a dangerous projectile.

| | RESISTANCE | WARNING | FORCE | TARGET LOCATION | RESISTANCE CONTINUED | RE-EVALUATE |
|---|---|---|---|---|---|---|
| +  - | PHYSICAL RESIST | YES | CONTROL AGAINST RESISTANCE | BACK | NO, EXPLAIN | YES |

**DESCRIBE THIS USE OF FORCE:**

The soundtruck gave force warning. While we were still moving the crowd out of the parking lot, a suspect wearing a red shirt with "media" markings on his clothing, repeatedly interfered with our forward progress by walking slowly in front of our police line. The suspect would turn and slowly walk backwards despite the numerous warnings I gave him that he needed to move out of our way.

As soon as I got within arms reach of the suspect, I pushed him in the back to force him to move away from our line. The suspect claimed I had not right to use force against him because of the temporary restraining order put in place by Judge Simon.

This suspects opinion, however, is false and does not give media immunity from committing crimes.

| | RESISTANCE | WARNING | FORCE | TARGET LOCATION | RESISTANCE CONTINUED | RE-EVALUATE |
|---|---|---|---|---|---|---|
| +  - | ACTIVE AGGRESS | YES | CHEMICAL AGENT | FACE | NO, EXPLAIN | YES |

| CHEMICAL AGENT | DEPLOYMENT | DISTANCE | |
|---|---|---|---|
| OC | SPRAY CAN | approximately 5 feet | |

**DESCRIBE THIS USE OF FORCE:**

The soundtruck gave force warning. We move the violent mob northbound on SE 106th Ave towards SE Washington St to prevent another attack on our officers and East Precinct. After we successfully moved the crowd, we still were being impacted by projectiles. Due to a blinding white light, numerous people on our line formation were unable to defend themselves from the incoming projectiles, and were at a greater risk of assault and injury because of the light. I located the source of the light, and I know form training and experience that these blinding bright lights are a tactic they intentionally use to allow other violent agitators to throw projectiles with impunity and assault defenseless officers.

Once I got close enough to the suspect with the blinding light, I deployed a one to two second burst of pepper spray at the suspects face. The suspect immediately covered his face and retreated to get care.

This use of force was a necessary response to active aggression via a coordinated tactic and conspiracy to commit the crime of assault on a police officer. The use of force was effective at preventing officers from being blinded and allowed them to defend themselves.

| YES | WHEN THE RESISTANCE DECREASED, I REDUCED MY AMOUNT OF FORCE TO A LEVEL REASONABLY CALCULATED TO MAINTAIN CONTROL. |
|---|---|

USE OF FORCE 04.26.20

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER     SITBON_CITY_002434
Exhibit 1 to Declaration of Juan Chavez-Page 3 of 5

DISORDERLY CONDUCT

## Portland Police Bureau
### GOVERNMENT AGENCY RELEASE

CASE NUMBER
GO 42 2020-681016

---

## *Force Data Collection Report*                Page 4 of 5

| CASE # | 2 0 2 0 - 6 8 1 0 1 6 | OFFICER | Lehman | DPSST | 5 1 0 7 3 | ☐ AMENDED |

**DESCRIBE WHY OTHER FORCE OPTIONS WERE REASONABLY CONSIDERED BUT NOT USED:**

All applications of force were the most appropriate given the circumstances.

**GENERAL DESCRIPTION OF THE FORCE YOU OBSERVED OTHER OFFICERS USE:**

I saw several pushes, but I do not have specific knowledge of places times or officers involved.

### SUBJECT INJURY AND/OR TREATMENT

| | TYPE OF INJURY | OBSERVATION | LOCATION OF INJURY | INJURY ATTRIBUTED TO | INJURY TREATMENT |
|---|---|---|---|---|---|
| + − | NO INJ./COMP. | | | | |

**BRIEF DESCRIPTION OF COMPLAINT, APPARENT, PRE-EXISTING INJURY OR ABSENCE OF INJURY:**

No injuries were observed to suspects in the crowd.

☐ THE SUBJECT WAS MEDICALLY CLEARED FROM THE FORCE EVENT

☐ THE SUBJECT WAS TRANSPORTED AND/OR ADMITTED BECAUSE OF MENTAL HEALTH ISSUES

☐ THE SUBJECT WAS TRANSPORTED AND/OR ADMITTED FOR DRUGS/ALCOHOL

### WITNESS

☐ I ATTEMPTED TO LOCATE WITNESSES AND NONE WERE LOCATED.

☐ [                    ] ATTEMPTED TO LOCATE WITNESSES AND NONE WERE LOCATED

☐ WITNESSES WERE LOCATED BUT THEY REFUSED TO GIVE THEIR CONTACT INFORMATION AND A DESCRIPTION OF THEM IS IN THE SECTION BELOW.

**WITNESS INFORMATION:** NAME OR DESCRIPTION (IF NAME REFUSED) AND MEMBER WHO LOCATED:

No witnesses came forward to give a statement during this incident. Based on the violent and hostile nature of the crowd and operational need for the team to stay together, no attempt was made to identify or interview witnesses.

### MEMBER INJURY

☐ I WAS INJURED DURING THIS INCIDENT

USE OF FORCE 04.26.20

---

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER    SITBON_CITY_002435

Exhibit 1 to Declaration of Juan Chavez-Page 4 of 5

DISORDERLY CONDUCT

## Portland Police Bureau
### GOVERNMENT AGENCY RELEASE

CASE NUMBER
GO 42 2020-681016



## Force Data Collection Report

Page 5 of 5

| CASE # | 2 0 2 0 | - | 6 8 1 0 1 6 | OFFICER | Lehman | DPSST | 5 1 0 7 3 | ☐ AMENDED |

**CEW OR LAUNCHABLE IMPACT MUNITION LOCATIONS:**

RIGHT SIDE      BACK      FRONT      LEFT SIDE

LEFT   RIGHT      RIGHT   LEFT

### SIGNATURE

| SIGNATURE | DPSST | | RANK | NAME |
|---|---|---|---|---|
| Craig Lehman | 51073 | EMAILED TO | SGT | Carroll |

**\*\*\*\*\*\*\*\*\*\*SUPERVISORS ONLY\*\*\*\*\*\*\*\*\*\***

| APPROVED BY: Carroll | | | DPSST: | 33550 |
|---|---|---|---|---|
| PSD: ONLY PERCEIVED MENTALLY ILL | PSD: ONLY SERIOUS USE OF FORCE | PSD: BOTH A SERIOUS USE OF FORCE ON A SUBJECT WITH PERCEIVED MENTAL ILLNESS | | SERGEANT: SUBMIT FINAL COPY TO RECORDS |

USE OF FORCE 04.26.20

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER        SITBON_CITY_002436
Exhibit 1 to Declaration of Juan Chavez-Page 5 of 5