# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **PHILLIP SITBON**, | Case No. 3:22-cv-1148-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **CITY OF PORTLAND**, **PORTLAND POLICE BUREAU OFFICER CRAIG LEHMAN,** and **JOHN DOES 1-10,** | |
| Defendants. | |

Juan C. Chavez, Oregon Justice Resource Center, P.O. Box 5248, Portland, OR 97208. Of Attorneys for Plaintiff.

Naomi Sheffield, Chief Deputy City Attorney, PORTLAND CITY ATTORNEY'S OFFICE, 1221 SW 4th Avenue, Room 430, Portland, OR 97204. Of Attorneys for Defendant City of Portland.

Karen M. O'Kasey and Zachariah H. Allen, HART WAGNER LLP, 1000 SW Broadway, Twentieth Floor, Portland, OR 97205. Of Attorneys for Defendant Craig Lehman.

**Michael H. Simon, District Judge.**

Phillip Sitbon has sued the City of Portland ("City") and Portland Police Officer Craig

Lehman. Sitbon asserts claims of excessive force under 42 U.S.C. § 1983 against the City and

Lehman, and a claim of unlawful retaliation under the First Amendment against only Lehman.[1]

---

[1] In his complaint, ECF 1, Sitbon also asserted a First Amendment claim and a battery claim against the City. Sitbon states in his response to Defendants' motions for summary

The City and Lehman each has moved for summary judgment. For the reasons described below, the Court GRANTS these motions.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting *Celotex*, 477 U.S. at 325)). "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "If the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

---

judgment that he voluntarily dismisses those claims. ECF 63 at 25. Accordingly, the Court does not address them further.

The Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson*, 477 U.S. at 252, 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986))

## BACKGROUND

By August 6, 2020, Phillip Sitbon had attended 15 to 20 protests that summer in downtown Portland. *See* Sitbon Depo. Tr. (ECF 52-1) 32:2-12, 32:19-33:10. He states that his primary purpose in attending these protests was to "capture video and support other people livestreaming." *Id.* 33:21-24. "Aside from interviewing people," he would "captur[e] the events happening at the protests, which [he] consider[ed] to be a journalistic activity." *Id.* 36:3-7.

Sitbon livestreamed the protests using a GoPro camera. *Id.* 41:4-6. The camera itself did not have any lights. *Id.* 41:12-14. During the summer, Sitbon mounted to his camera three small LED camera lights; these lights provided about ten feet of illumination. *Id.* 41:15-25, 42:17-21, 44:7-9. Sitbon supplemented these mounted lights with handheld, battery-powered flashlights so that he could illuminate longer distances. *Id.* 43:1-3, 43:19-25. One of these flashlights was the Nitecore Tiny Monster 28 ("TM 28"), which had a range of about 250 feet and cost about $500. *Id.* 44:10-15, 73:11-13, 73:24-25.

On August 6th, Sitbon arrived near Southeast 106th and Washington Street sometime between 11:30 p.m. and midnight. *Id.* 50:4-7, 50:17-18. He was accompanied by a friend,

Carissa Desmond. *Id.* 50:16-23. Sitbon began filming from the parking lot and filmed off-and-on

for about three to four hours. *See id.* 52:11-15, 53:1-10. Sitbon wore a bright orange sweatshirt

and a neon orange backpack. *See* ECF 52-4 at 0:13.[2] He wore a helmet, eyeglasses, and a face

mask. *Id.* at 0:17. Sitbon also wore a "press badge" around his neck, a patch on his backpack that

said "press," and had several glow-in-the-dark or reflective "press" patches on his helmet. Sitbon

Depo. Tr. 36:13-21. He carried his filming equipment, consisting of his camera and lights

mounted on a gimbal and flashlights. *Id.* 70:20-25; ECF 52-4 at 0:04. At the beginning of his

filming that night, Sitbon held his gimbal in one hand and a less powerful flashlight—not the

TM 28—in the other. Sitbon Depo. Tr. 71:1-12; ECF 52-4 at 6:12, 9:30.

Sitbon and Desmond met up with protestors and others who were filming, and during the

next forty minutes, walked with them across several streets. *See generally* ECF 52-3 at 7:04-

46:00. Both filmed the protests on their own devices. *Id.* During that time, they observed police

officers and police vehicles driving by. *Id.* On at least two occasions, officers issued warnings by

means of a long-range acoustic device that the protest was an unlawful assembly and began to

order individuals to disperse to another area. *Id.* at 8:22-9:17, 38:55-39:55. These warnings

stated that failure to disperse could result in the use of force. *See id.* Sitbon generally complied

with the orders to move and stayed largely on the sidewalk while filming. *See generally id.* As he

filmed, he frequently shone his flashlight at officers or into their vehicles, including into their

faces and eyes. *See, e.g.*, *id.* at 16:49-17:03. Occasionally, officers would shine their flashlights

back at Sitbon. *See, e.g.*, *id.* at 17:00, 24:25. On one occasion, an officer instructed Sitbon to turn

his flashlight off. *See id.* at 27:21-23 ("Turn your light off, you're trying to blind us. Turn your

_____

[2] The parties submit as exhibits recorded video footage from the August 6th protest. In
this case, "0:13" references what is happening at 13 seconds into the video.

light off."). Sitbon responded: "Turn *your* light off, f*** you." *Id.* at 27:24-30. After the officer

did not turn off his light, Sitbon yelled profanities in the officer's direction and ultimately said,

"Well, okay, he's leaving his on, I'm leaving mine on." *Id.* at 27:58-28:03. The officer again

instructed Sitbon to turn off his light, and Sitbon again responded with profanities. *Id.* at 29:08-

29:14. By the time of this encounter, Sitbon had swapped his standard flashlight out for his

TM 28. *Id.* at 19:28-33. Unlike Sitbon's standard flashlight, the TM 28 was a powerful flashlight

with a range of at least 250 feet.

Eventually, the officers' "skirmish line" moved a larger crowd to a patch of sidewalk at

an intersection. *Id.* at 45:00. Lehman and other officers held the skirmish line, preventing

protestors from going back down the street from which they had just been instructed to leave. *Id.*

at 45:12; Lehman Decl. (ECF 51) ¶¶ 4, 6. Lehman and his colleagues stood within a few feet of

the protestors. ECF 52-43 at 45:12. At this point, no protestors in that group appeared to be

throwing projectiles at officers or otherwise engaging with them physically. *See id.*

Although Sitbon was close to the front of the group of protestors, there were others

standing between him and Lehman. *See id.* Sitbon turned his flashlight on and shined it toward

the officers in front of him. *Id.* at 45:16-18. Within seconds, at least three officers in the vicinity

began to shine their lights back. *Id.* at 45:20. Sitbon turned his light off. *See id.* at 45:48 ("Look,

it's off."). At least one of the officers continued to shine a flashlight at Sitbon. *Id.* at 45:54.

Sitbon yelled for the officer to turn off the light. *Id.* at 45:48-55. Sitbon then turned his light back

on. Sitbon Depo. Tr. (ECF 65 at 12) 100:22-25. A flashlight then shined in the direction of where

the officers were standing. ECF 52-3 at 46:02-05. A light illuminated the officer who was

shining the flashlight, but also briefly passed over Lehman's face. *Id.* at 46:05.

Sitbon states that although he had his light on, he turned it off when officers began shining their lights in his face. He states that he then turned his light back on after the officers continued to shine their lights on him to show the officers that he had previously complied. Sitbon, however, does not concede that the light that shone over Lehman's face at 46:05 of ECF 52-3 was his. This dispute, however, is not material because Sitbon agrees that he *did* turn his flashlight on again (just before he was pepper sprayed), and Lehman states that he pepper sprayed Sitbon because Sitbon's light was blinding the officers in the area generally, and not only because of the light that passed over *his* face at 46:05 of ECF 52-3.

About five seconds after Sitbon turned his light back on, Lehman left the police line, entered the crowd, and applied a one-second burst of pepper spray to Sitbon's face. *Id.* at 46:07-46:10. Lehman did not speak to Sitbon before or after deploying the pepper spray. *Id.* Aside from using the pepper spray, Lehman did not have any other physical contact with Sitbon. *Id.* The pepper spray caused Sitbon considerable pain, and he had difficulty seeing for a time. *Id.* at 46:48-47:15. At some later point in the night, Sitbon says on camera that he is "recovering" and can "mostly see now." ECF 52-5 at 1:21-24. Sitbon left the protest at about 3:00 a.m., several hours later. Sitbon Depo. Tr. (ECF 52-1) 54:22-25.

## DISCUSSION

### A.  Excessive Force under the Fourth Amendment

"For purposes of the Fourth Amendment, a seizure occurs when a law enforcement officer, by means of physical force or show of authority, in some way restrains the liberty of a citizen." *United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997). Here, the parties do not dispute that Lehman's use of pepper spray constituted a seizure. The Court turns next to the *reasonableness* of Lehman's use of force under the circumstances.

"Under the Fourth Amendment, police may use only such force as is objectively reasonable under the circumstances." *LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000). To determine whether the force used during a seizure was reasonable, courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quotation marks omitted). Thus, the Court first "assess[es] the gravity of the particular intrusion on Fourth Amendment interests," then "assess[es] the importance of the government interests at stake," and finally, "balances[s] the gravity of the intrusion on the individual against the government's need for that intrusion to determine whether it was constitutionally reasonable." *Young v. County of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011) (quotation marks omitted). "Although on summary judgment we view the evidence in the light most favorable to [the nonmovant], 'the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010) (quoting *Graham*, 490 U.S. at 396) (cleaned up).

**1.  Severity of Intrusions**

"The gravity of the particular intrusion that a given use of force imposes upon an individual's liberty interest is measured with reference to the 'type and amount of force inflicted.'" *Young*, 655 F.3d at 1161 (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001)). The Ninth Circuit has characterized the use of pepper spray as "intermediate force" because it is "capable of inflicting significant pain and causing serious injury . . . . while less severe than deadly force." *Id.*; *see also id.* at 1162 (describing the severe inflammatory effects of pepper spray on a target's eyes, nose, and throat). In this case, Lehman sprayed Sitbon in the face with pepper spray for about one second. The video footage illustrates that the pepper spray

landed in Sitbon's eyes such that he was in considerable pain and could not open his eyes or see for several minutes and led to pain and irritation that lasted for hours. In addition, the use of pepper spray triggered Sitbon's ankylosing spondylitis, causing Sitbon increased levels of pain, difficulty turning his head, and difficulty closing his hand for days after the incident.

### 2. Government Interests

In the second step of the *Graham* analysis, the Court evaluates the government's interest by assessing: (a) the severity of the crime; (b) whether the suspect posed an immediate threat to the officers' or public's safety; and (c) whether the suspect was "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. These factors are not exclusive, and the Court looks to the totality of the circumstances. *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). The Ninth Circuit has stated, however, that "the most important single element of the three specified factors" is whether the suspect posed an immediate threat to the safety of the officer or others. *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994); *see also Young*, 655 F.3d at 1163 ("Of the three factors we traditionally examine in determining the governmental interest, the most important is whether the individual posed an immediate threat to officer or public safety.").

Defendants do not persuasively argue that Sitbon was committing a crime. Lehman suggests in footnote 4 of his reply in support of his summary judgment motion that Sitbon violated Oregon Revised Statutes ("ORS") § 162.247(1), which criminalizes the act of interfering with a peace officer. But there is no evidence that any officer, including Lehman, told Sitbon that he was violating the law by using the TM 28 or attempted to place Sitbon under arrest after he was incapacitated by the pepper spray. *Cf. Nelson v. City of Davis*, 685 F.3d 867, 879 (9th Cir. 2012) (holding that the absence of arrest or further engagement from officers shows a lack of serious criminal behavior). Moreover, a violation of that statute is a misdemeanor, not a

felony. *See* ORS § 162.247(2). Therefore, if Sitbon *had* violated the statute, however, his conduct would have amounted at most to only a minor infraction. *Cf. Nelson*, 685 F.3d at 879-80 (holding that a legally punishable offense that is a misdemeanor is "a minor infraction that justifies, at most, only a minimal use of force").

The Court next turns to whether Sitbon posed an immediate threat to the officers' or public's safety. Defendants argue that by shining a light into the officers' faces, Sitbon posed an immediate threat to the safety of officers and others. Lehman asserts that just before Sitbon began shining his light in the faces of the officers, the police were involved in physical skirmishes with the crowd, including attempts by protestors to set a police precinct on fire. *See* Lehman Decl. ¶¶ 3-5; *see also* Lehman Depo. Tr. 105:7-21 (ECF 52-7) (explaining that the crowd was "escalated [and] aggressive," that officers were being hit with water bottles and rocks "throughout the course" of the night). Lehman argues that when Sitbon shined his flashlight in Lehman's and other officers' eyes, Sitbon prevented Lehman and his colleagues from being able to see and thus, safely do their job. *See, e.g.*, Lehman Depo. Tr. 104:7-12 (explaining that officers were "blinded by the light, and they couldn't see, and they were squinting their eyes"); *id.* 106:11-23 ("[I]t's painful to look at a bright light, and it was inhibiting [officers'] ability to see what was directly in front of them . . . it was impeding my ability to see, and I was standing right next to them."). Sitbon responds that having a bright light directed at Lehman did not present an "immediate" threat to Lehman's safety; according to Sitbon, it was, at most, "bothersome." Sitbon further asserts that according to video footage and testimony, there were no projectiles being thrown at Lehman at the moment leading up to the pepper spray incident. Lehman replies that whether projectiles were being thrown immediately before he deployed pepper spray is irrelevant because officers need to be able to see to do their jobs at *all* times.

The Court finds that there is no genuine dispute of fact as to whether the flashlight prevented Lehman and his colleagues from safely being able to do their duties. As noted, the TM 28 was a powerful, heavy-duty flashlight. Sitbon was *well* within its 250-foot range when he shined it at Lehman. Aside from challenging Lehman's statement with Sitbon's personal opinion, Sitbon presents no evidence in support of his position that the bright light directed at Lehman did not present an "immediate" threat to Lehman's safety and the safety of other officers. Even if there were no active projectiles in the moments leading up to the pepper spray incident, the Court agrees with Lehman that officers must be able to see in order to safely do their jobs at all times.

The Court also considers whether Sitbon received a warning before Lehman pepper sprayed him, and whether a such a warning would have been feasible. *See Deorle*, 272 F.3d at 1283-84 ("The absence of a warning or an order to halt is also a factor that influences our decision. . . . Our cases demonstrate that officers provide warnings, *where feasible*, even when the force used is less than deadly." (emphasis added)); *see also Robinson v. Solano County*, 278 F. 3d 1007, 1009 (9th Cir. 2022) (noting that the calculus of reasonableness "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation"). The Court has reviewed the video footage from the moments preceding the encounter and did not hear Lehman or any other officer warn Sitbon to

*turn off his lights*[3] *or he would be pepper sprayed.*[4] In those moments, protestors remained on the sidewalk. Although protestors were yelling, nobody was actively throwing anything at the officers or otherwise acting violently. A reasonable jury could find that Lehman had the time and to inform Sitbon that Sitbon would be pepper sprayed if he continued to shine a flashlight in Lehman's eyes. Lehman notes that he did not provide any warning to Sitbon because he did not think Sitbon would have complied. Lehman Depo. Tr. 161:24-162:17. But whether Sitbon would have complied with the force warning does not alter the conclusion that *providing* a force warning was feasible.

In addition to providing force warnings, a reasonable jury could find that Lehman had other alternatives available to him. *See Nelson*, 685 F.3d at 882 ("[A]lthough officers are not required to use the least intrusive degree of force possible, the availability of alternative methods is a relevant factor in determining whether the amount of force used . . . was, in fact, reasonable." (cleaned up)). In other words, although the excessive force analysis does not require that Lehman

---

[3] The Court agrees with Sitbon that the sound trucks' general force warning ("This is still an unlawful assembly. You need to disperse from the area. Remain on the sidewalk. Stay out of the street. You could be subject to force, arrest, or citation. Disperse from the area.") involved *dispersal*, not the use of a flashlight. At the time he was pepper sprayed, Sitbon had moved out of the street as directed and was on the sidewalk. The Court is also not persuaded that officers shining their flashlights at Sitbon constituted a force "warning" because those officers did not inform Sitbon of the consequences of not doing what they instructed.

[4] The Court notes that about 17 minutes after Sitbon started filming, an officer verbally reacted to the flashlight. *See* ECF 52-3 at 17:15-20. The officer was in the middle of a street, boarding a police vehicle; Sitbon stands across from him on the sidewalk. The Court cannot discern whether the officer says, "*Let's* get those lights out of our eyes," (urging his colleagues to take action) or "*Please* get those lights out of our eyes" (directing Sitbon to stop shining his flashlight). This ambiguity does not appear to be material, because even if the officer were issuing a directive towards Sitbon, he did not issue a force warning (*e.g.*, informing Sitbon that the consequence of noncompliance is getting pepper sprayed). As for the officer who told Sitbon to "[t]urn your light off, you're trying to blind us," *id.* at 27:21-23, his instruction also did not include a force warning.

acted in the *most* reasonable fashion, the array of options open to Lehman contributes to the analysis of whether the force he *did* use was, considering the circumstances, objectively reasonable. Lehman testified that he had seized flashlights from protestors in the past for the purpose of making them stop shining bright lights, and that doing so was "always an option," including in this case. Lehman Depo. Tr. 161:9-14. There is nothing in the record to explain why Lehman or any other officer did not confiscate Sitbon's flashlight instead of using pepper spray.

The parties dispute whether Sitbon engaged in active or passive resistance by refusing to turn off his flashlight. Lehman argues that "[t]he fact that [Sitbon] turned the light off and then back on again reasonably indicated to the officers that his noncompliance was not accidental but willful defiance." Sitbon concedes that he did turn his light off and on again but argues that this conduct did not amount to willful defiance. Instead, Sitbon argues, he turned his light back on and attempted to shine it above the officers' heads "to signal to them" that the light had previously been turned off.

The Court notes that Sitbon's statement that he turned his light on only to "signal" the officers is undermined by his statements in the video footage suggesting that he was using his light intentionally to irritate the officers. Indeed, Sitbon stated, regarding his pointing the flashlight toward the officers, "oh, they hate it," ECF 52-3 at 17:49, and asking his companion, "you wanna see them get annoyed again?", *id.* at 26:58, before shining his flashlight at officers. In response to officers' commands for Sitbon to turn off his flashlight, Sitbon repeatedly answered by yelling profanities. *See, e.g.*, *id.* at 24:55 ("F*** you, f*** your lights!"); *id.* at 27:25 ("Turn *your* light off! F*** you!"); *id.* 27:38 ("So, our lights aren't okay, but they can blind us all they want. That makes all the sense. Turn your light off, f******!"); *id.* at 29:08 ("Go f**** yourself! Listen to him, he's whining like a f****** child.").

To the extent that Sitbon's motivation for shining his flashlight at officers comes down to a question of Sitbon's credibility, the jury—not the Court—should make that determination. But as will be discussed in greater detail below, there is a legal question as to whether Sitbon's conduct—using a flashlight to blind officers, despite commands to turn it off—"could rise only to the level of passive resistance." *See Nelson*, 685 F.3d at 82 (collecting cases holding that "active resistance is not to be found simply because of a failure to comply with the full extent of an officer's orders."). At this stage, the Court notes only that a reasonable jury could find that Sitbon's conduct did interfere with the officers' duties to hold the protest line and that Sitbon used the flashlight for that improper purpose.

### 3. Balancing

Balancing the intrusion on Sitbon's Fourth Amendment interests with the government's need for that intrusion weighs in Sitbon's favor, albeit only slightly. Viewing the facts in the light most favorable to Sitbon, the force used against him was not justified by the government interests at stake. Of course, what may result at trial is a different story. A reasonable jury could find, for example, that Sitbon was using the light primarily to interfere with or irritate officers instead of for legitimate filming purposes. Alternatively, a reasonable jury could find that even if Sitbon risked causing serious harm to the officers and the public, that potential harm was not so immediate that force warnings were not feasible in the moment. At this stage, genuine disputes of material fact preclude summary judgment for Defendants on Sitbon's excessive force claim.

## B. Qualified Immunity for Excessive Force Claim (Lehman)

### 1. Applicable Law

"The doctrine of qualified immunity protects government officials from liability for civil damages . . . ." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks omitted). "Qualified immunity balances two important interests—the need to hold public officials

accountable when they exercise power irresponsibly and the need to shield officials from

harassment, distraction, and liability when they perform their duties reasonably." *Id.* "Whether

qualified immunity can be invoked turns on the objective legal reasonableness of the official's

acts. And reasonableness of official action, in turn, must be assessed in light of the legal rules

that were clearly established at the time the action was taken." *Ziglar v. Abbasi*, 582 U.S. 120,

151 (2017) (cleaned up). "The privilege is an *immunity from suit* rather than a mere defense to

liability; . . . it is effectively lost if a case is erroneously permitted to go to trial." *Saucier v.*

*Katz*, 533 U.S. 194, 200-01 (2001) (emphasis in original) (quotation marks omitted). For this

reason, the Supreme Court has "stressed the importance of resolving immunity questions at the

earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam).

Qualified immunity, however, is only an immunity from suit for damages, it is not an immunity

from suit for declaratory or injunctive relief. *See L.A. Police Protective League v. Gates*, 995

F.2d 1469, 1472 (9th Cir. 1993).

      In *Saucier*, the Supreme Court outlined a two-step process for determining the

applicability of the qualified immunity doctrine. 533 U.S. at 200. The first step is to determine

"whether a constitutional right would have been violated on the facts alleged." *Id*. The second

step is to determine "whether the right was clearly established." *Id*. The constitutional issue,

however, need not be addressed first in every case. *Pearson*, 555 U.S. at 227. Regardless of

whether the constitutional violation occurred, the officer should prevail if the right asserted by

the plaintiff was not clearly established or the officer could have reasonably believed that his

specific conduct was lawful. *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991).

      To determine whether a government official's conduct violates clearly established law, "a

court must ask whether it would have been clear to a reasonable officer that the alleged conduct

was unlawful in the situation he confronted." *Abbasi*, 582 U.S. at 152 (quotation marks omitted).

To be clearly established:

> It is not necessary . . . that the very action in question has previously been held unlawful. That is, an officer might lose qualified immunity even if there is no reported case directly on point. But in the light of pre-existing law, the unlawfulness of the officer's conduct must be apparent.

*Id.* (cleaned up). "The 'clearly established' requirement 'operates to ensure that before they are subject to suit, [government officials] are on notice their conduct is unlawful.'" *Eng v. Cooley*, 552 F.3d 1062, 1075 (9th Cir. 2009) (alteration in *Eng*) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Thus, the key inquiry in determining whether an officer has qualified immunity is whether the officer had "fair warning" that his conduct was unconstitutional. *Hope*, 536 U.S. at 741; *see also Saucier*, 533 U.S. at 202 (noting that the law need not be a "precise formulation of the standard" as long as "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand"); *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1064 (9th Cir. 2013) ("Rather, the relevant question is whether 'the state of the law at the time gives officials fair warning that their conduct is unconstitutional.'" (quoting *Bull v. City & County of San Francisco*, 595 F.3d 964, 1003 (9th Cir. 2010) (en banc)). Courts must avoid the "danger of a rigid, overreliance on factual similarity." *Hope*, 536 U.S. at 742-43 (concluding that reasonable officers received fair warning from the "reasoning" of a case "though not the holding," even though "the facts of the case are not identical").

A court in this circuit first looks to binding precedent from the Supreme Court or the Ninth Circuit. *Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004). After that, "in the absence of binding precedent, [courts] look to whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of

state courts, other circuits, and district courts." *Id.* (quotation marks omitted). The plaintiff bears

the burden of making a showing that the right was clearly established at the time of the alleged

violation. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002). When considering whether

qualified immunity applies, the court must resolve all factual disputes in favor of the party

asserting the injury. *Ellins*, 710 F.3d at 1064.

### 2. Excessive Force Claim

The parties focus their discussion of clearly established law within the Fourth

Amendment context on *Puente v. City of Phoenix*, 123 F.4th 1035 (9th Cir. 2024). Lehman

argues that *Puente* "resolves the qualified immunity issue in this case as a matter of law" because

that decision "provides officers with latitude to use chemical irritants to maintain safety at public

protests where there are safety concerns." This argument is unpersuasive. In *Puente*, the Ninth

Circuit conducted a detailed review of the facts supporting each plaintiff's allegations in order to

conclude that there was no constitutional violation or that qualified immunity was appropriate.

*See generally* 123 F.4th at 1057-61. These facts are distinguishable from the facts in this case.

Thus, *Puente* does not establish "as a matter of law" that officers have broad latitude to use

chemical irritants as, for example, Lehman did in August 2020. Moreover, the qualified

immunity analysis looks to law that was clearly established *at the time* of the alleged rights

violation. *See, e.g.*, *Sorrels*, 290 F.3d at 970. *Puente* was decided in 2024; Sitbon encountered

Lehman in 2020. Therefore, *Puente* does not answer the question of whether Sitbon's right

against being pepper sprayed under the circumstances was clearly established on August 6, 2020.

Turning to Sitbon's cases, the Court finds that *Young* does not clearly establish Sitbon's

rights in this case, either. In *Young*, the Ninth Circuit reversed the district court's grant of

summary judgment to an officer on the plaintiff's excessive force claim. *See* 655 F.3d at 1170.

There, the officer pepper sprayed the plaintiff—who was seated on a sidewalk eating broccoli—

and continued to spray him even as the plaintiff rose and began to back away. *Id.* at 1161. The officer then repeatedly struck the plaintiff with his baton, landing hits to the plaintiff's shin and again while the plaintiff was lying on the ground. *Id.* The Court held that the use of pepper spray—which lasted "at least several seconds" and "involved more than just a minimal burst designed to startle [the plaintiff]"—*in addition* to the baton strikes amounted to "a significant amount of two forms of intermediate force known to cause serious pain and to lead in some cases to serious physiological consequences." *Id.* at 1162. Here, Lehman did not use force beyond the pepper spray. Moreover, he deployed only a brief, one-second spray, not one that lasted several seconds. Thus, *Young* does not clearly establish that a lesser amount of force, exerted for a shorter duration, would have violated Sitbon's rights.

Sitbon presents two additional cases in support of his argument that his right was clearly established, *Headwaters Forest Defense v. County of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002), and *Nelson*, 685 F.3d at 886. The Court finds that *Headwaters* is inapposite; in that case, the Ninth Circuit held that officers' use of pepper spray was excessive *because* the officers already had "control" over the protestors. *See* 276 F.3d at 1130 ("Because the officers had control over the protestors it would have been clear to any reasonable officer that it was unnecessary to use pepper spray to bring [the protestors] under control . . . ."). Specifically, the protestors targeted with pepper spray had linked themselves together using "black bears"—self-releasing lock-down devices—that inhibited their movement. *Id.* at 1127-28. Here, by contrast, there is no evidence that Lehman had any "control" over Sitbon or that Sitbon's movement was in any way restricted before he was sprayed.

*Nelson*, also does not clearly establish Sitbon's right not to be pepper sprayed under the relevant circumstances. In *Nelson*, officers arrived to disperse the approximately 1,000 people

who congregated at an apartment for "the biggest party in history." *See* 685 F.3d at 872-73.
Officers issued parking tickets to illegally parked vehicles and began citing students for underage
drinking. *Id.* at 873. Upon learning that some attendees were rocking a car and breaking bottles,
the owner of the apartment requested the officers to order non-residents to leave the area. *Id.* To
do so, the officers initially informed those around the edges of the crowd that they were
trespassing and needed to leave, but when that method proved ineffective, 30 to 40 officers
assembled in riot gear, armed with pepperball guns.[5] *Id.* The officers issued a verbal order to
disperse and formed a "skirmish line" in order to move through the crowd. *Id.* Several students,
including Nelson, attempted to leave the party but the officers had blocked their exit route and
did not provide instructions for where to go. *Id.* at 874. The students asked the officers to inform
them what they wanted the students to do; they did not hear any commands until after the
officers began to shoot the pepperball guns. *Id.* A pepperball struck Nelson in the eye. *Id.*

　　The Ninth Circuit held that the officers' use of the pepperball gun constituted excessive
force. Nelson, however, is inapposite for at least two reasons. First, the court emphasized the
serious harm caused by a pepperball projectile because it "encompassed both the physical blow
from the force of the projectile and the chemical effects of pepper spray." *Id.* at 878. The
pepperball that struck Nelson—launched from a gun—was so forceful that Nelson "suffered
temporary blindness, and 'a permanent loss of visual acuity,' and endured 'multiple surgeries to
repair the ocular injury he sustained.'" *Id.* at 874. The Ninth Circuit explained that pepperball
projectiles "merely combine two types of force that we have already recognized as unreasonable
when aimed at individuals who pose no threat and have committed, at most, minor offenses." *Id.*

---

　　　　[5] "Pepperball guns are, in essence, paintball guns that fire rounds containing oleoresin
capsicum ('OC') powder, also known as pepper spray." *Id.*

at 884. But in its analysis, the court focused on the *combined* effect of a tool with both chemical and concussive capabilities. Thus, the Court does not find the use of a pepperball gun to be interchangeable with a one-second burst of pepper spray.

Additionally, the *Nelson* court emphasized that at most, Nelson's conduct rose to the level of "passive resistance." *Id.* at 881.[6] "Passive resistance," however, is not clearly defined. The Ninth Circuit has suggested that a variety of behavior may constitute passive resistance. *See, e.g.*, *Young*, 655 F.3d at 1165-66 (repeated refusal to reenter vehicle at officer's command is not active resistance); *Bryan v. MacPherson*, 630 F.3d 805, 829-30 (9th Cir. 2010) (repeated failure to comply with officer's command to remain in vehicle was not active resistance); *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc) (reentry of home and refusal to remove hands from pockets despite officers' orders to place hands on head and walk toward them was not active resistance); *Headwaters*, 276 F.3d at 1130 (remaining seated and using "black bear" devices despite officers' orders to disperse was not active resistance).[7]

But *Nelson* and these earlier cases present different facts than this case. Sitbon was not *just* standing on the sidewalk or *just* refusing to move where officers commanded. Instead, he was actively shining an especially powerful flashlight directly at officers, causing them to be unable to see their surroundings while they were trying safely to perform their duties. In other words, although Sitbon did not make physical contact with officers, he resisted in a way that

---

[6] As the court explained, Nelson and his companions "were attempting to leave the party" and "*stood* in the breezeway *awaiting instructions* from the police." *Id.* at 874 (emphasis added). At most, this conduct constituted a trespass, *id.* at 879-80, and there was an "absence of exigency," *id.* at 880.

[7] If Sitbon appeals this decision to the Ninth Circuit, such an appeal may be an appropriate opportunity for the Ninth Circuit to clarify the parameters of "passive resistance," especially in cases such as this one, where an individual does not make physical contact with an officer but resists in a way that still physically impacts the officer.

physically *impacted* officers and potentially endangered them. The Court is unaware of clearly established law stating that this type of conduct rises only to the level of passive resistance. Therefore, the Court finds that Sitbon has failed to establish that his right not to be pepper-sprayed under the circumstances was clearly established. Lehman is entitled to qualified immunity on this claim.

## C. Retaliation under the First Amendment

To establish a claim of First Amendment retaliation, Sitbon must show that: (1) he was engaged in a constitutionally protected activity; (2) Lehman's actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was a substantial or motivating factor in Lehman's conduct. *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006). The parties do not dispute the first element. Sitbon argues that he was engaged in protected journalistic activity and attended the protest "as a member of the press" to film, record, and livestream police and protest activity. Lehman concedes that Sitbon's filming is a recognized protected activity under the First Amendment. The parties also do not seriously dispute that getting pepper sprayed in the face would chill a person of ordinary firmness from continuing to engage in a protected activity such as filming.[8] Thus, the Court focuses the rest of this discussion on the third element, causation.

---

[8] The Court observes that minutes after Lehman sprayed Sitbon, Sitbon resumed walking and filming. The Court does not find Sitbon's continued filming dispositive, however, because "ordinary firmness" is an objective standard that will not "allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity." *Mendocino Env't Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999). *Cf. Alsaada v. City of Columbus*, 536 F. Supp. 3d 216, 269 (S.D. Ohio 2021) (observing that officers' use of tear gas and pepper spray "have been sufficient to deter some protestors from protesting again").

Sitbon argues that he was engaged in a constitutionally protected activity—recording the protests as a member of the press—and that Lehman pepper sprayed him to stop that activity. Specifically, Sitbon argues that a reasonable jury could conclude that *his* comments that "[the police] really hate [his flashlight]" and "[t]hey hate it so much" meant that the police did not want their identifiable features illuminated on camera. Sitbon argues that this inference would show a causal connection between his conduct and Lehman's allegedly retaliatory act. Lehman argues that Sitbon's observation that—in Sitbon's opinion—the officers hated the flashlight is insufficient to establish Lehman's motivations and actions. Lehman asserts that he used pepper spray because he wanted the light turned off and *not* because of the underlying filming activity.

The Court finds that Sitbon has failed to show a genuine dispute of material fact as to the third element of this claim. The Court acknowledges that video footage from Carissa Desmond shows that Sitbon had the word "press" written on at least three places on his helmet. But Lehman stated at deposition that he did not recall what Sitbon was wearing or seeing on Sitbon any insignia that designated Sitbon as press. Lehman Depo. Tr. 111:25-112:7. Lehman further stated that he did not see that Sitbon was recording. *Id.* at 112:4-5; Lehman Decl. ¶ 9 ("I was unaware [Sitbon] was filming at the time I administered the spray as his light prevented me from seeing."). There is no evidence in the record that Lehman ever asked Sitbon—or any other protestor—to stop recording or said anything else about Sitbon being part of the press. Based on the size of the chanting crowd and the flashing lights, a reasonable jury could find Lehman's testimony credible and conclude that Lehman could not see what Sitbon was wearing or that Sitbon was filming. More significantly, unless one simply disbelieves Lehman, there is no evidence that Sitbon's filming, as opposed to his flashlight shining, was the motivation for Lehman's actions. Summary judgment is appropriate on Sitbon's claim of retaliation.

**D.  *Monell* Liability (City of Portland)**

In his complaint, Sitbon asserts three allegations of liability under *Monell*. He alleges that the City of Portland: (1) failed to train; (2) failed to supervise; and (3) failed to discipline Lehman for past rights violations. In Plaintiff's response to summary judgment, however, he argues only the last one: that the City is liable for failing to discipline Lehman in previous cases where Lehman used allegedly excessive force against others. Specifically, Sitbon argues that "[t]he City's custom of toothless reprimand of Defendant Lehman's excessive use of force was the but-for cause to Mr. Sitbon's injury." The Court construes Sitbon's response as a waiver of the other *Monell* allegations alleged in his complaint and proceeds to discuss only Sitbon's *Monell* claim for failure to discipline.

**1.  Applicable Law**

Section 1983 provides "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected" any person within the jurisdiction of the United States the "deprivation of any rights, privileges, or immunities secured by the Constitution and the laws, shall be liable to the party injured." 42 U.S.C. § 1983. Although a municipality or other local government is a "person" who may be sued under § 1983, *Duarte v. City of Stockton*, 60 F.4th 566, 568 (9th Cir. 2023), it may not be held liable "for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs. of City of NY*, 436 U.S. 658, 694 (1978). In other words, § 1983 does not allow recovery for the actions of a local government's employees under a theory of *respondeat superior* liability. *Id.* at 691. Instead, a plaintiff must demonstrate that a municipality had a "policy" that was the "moving force" behind a violation of the plaintiff's constitutional rights. *See Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013); *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

To meet the "moving force" requirement, "the plaintiff must show both causation-in-fact and proximate causation." *Gravelet-Blondin*, 728 F.3d at 1096. A plaintiff can demonstrate causation-in-fact "only if the injury would not have occurred 'but for' [the defendant's] conduct." *Chaudhry v. Aragón*, 68 F.4th 1161, 1169 n.11 (9th Cir. 2023) (quoting *White v. Roper*, 901 F.2d 1501, 1505 (9th Cir. 1990)). In the context of *Monell* liability, a plaintiff can meet this burden by "establish[ing] that the injury would have been avoided had proper policies been implemented." *Long v. County of Los Angeles*, 442 F.3d 1178, 1190 (9th Cir. 2006) (quotation marks omitted). To demonstrate proximate causation, a plaintiff must establish that any "intervening actions were within the scope of the original risk and therefore foreseeable." *Van Ort v. Est. of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996) (quoting *Dodd v. City of Norwich*, 827 F.2d 1, 6 (2d Cir. 1987)).

"A 'policy' is a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (cleaned up). A plaintiff can show a "policy," as that term is used for *Monell* liability, "in one of three ways." *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 883 (9th Cir. 2022).

> First, the [municipality] may be held liable if it acted pursuant to an expressly adopted official policy. Second, the [municipality] may be held liable based on a longstanding practice or custom. Third, the [municipality] may be held liable if the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it.

*Id.* (cleaned up); *see also Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."); *Gordon v.*

*County of Orange*, 6 F.4th 961, 973-74 (9th Cir. 2021) (describing the three ways "[a] plaintiff can satisfy *Monell's* policy requirement").

The Ninth Circuit recognizes that a local government body can be held liable under § 1983 for "policies" of inaction or omission. Some cases, generally older decisions, refer to this as a separate "path" to liability distinct from the "direct path" of the municipality *itself* violating the plaintiff's rights or directing its employees to do so.[9] *See Gibson v. County of Washoe*, 290 F.3d 1175, 1185 (9th Cir. 2002), *overruled on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016); *see also Tsao*, 698 F.3d at 1144. In this separate path to liability, a municipality can be held responsible "for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation." *Gibson*, 290 F.3d at 1186; *see also Tsao*, 698 F.3d at 1143; *Hyun Ju Park v. City & County of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020). More recent cases, however, generally describe claims for such policies of inaction or omission as a type of custom or practice claim. *See, e.g.*, *Sabra*, 44 F.4th at 884; *Gordon*, 6 F.4th at 973. Regardless of how such claims are categorized, the Ninth Circuit is consistent in describing the heightened requirements that a plaintiff must show to prove a violation based on inaction or omission to avoid imposing *respondeat superior* liability.

A policy of inaction or omission may be based on a government body's "failure to implement procedural safeguards to prevent constitutional violations." *Tsao*, 698 F.3d at 1143;

---

[9] "Under [the] 'direct path' to municipal liability, a plaintiff must prove that the municipality acted with the state of mind required to prove the underlying violation, just as a plaintiff does when he or she alleges that a natural person has violated his federal rights." *Tsao*, 698 F.3d at 1144 (quotation marks omitted).

*see also Sabra*, 44 F.4th at 884. For example, "[a] section 1983 plaintiff may attempt to prove the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded." *Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir. 1992); *see also Elifritz v. Fender*, 460 F. Supp. 3d 1088, 1120 (D. Or. 2020) (evaluating a failure to discipline theory).

A plaintiff who alleges a policy of inaction, however, must establish that such a policy amounts to deliberate indifference to the plaintiff's constitutional rights. *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997); *Hyun Ju Park*, 952 F.3d at 1141; *see also Oviatt ex rel. Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) ("To impose liability on a local governmental entity for failing to act to preserve constitutional rights, a section 1983 plaintiff must establish: (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation." (quotation marks omitted)).

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (cleaned up). "Deliberate indifference exists when the need for more or different action is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Hyun Ju Park*, 952 F.3d at 1141 (cleaned up). "This requires a showing that the facts available to the [municipality] put it on actual or constructive notice that its practices . . . were substantially certain to result in the violation of the constitutional rights of its citizens." *Sandoval v. County of San Diego*, 985 F.3d 657, 682 (9th Cir. 2021) (cleaned up).

Deliberate indifference ordinarily is shown through "a pattern of prior, similar violations of federally protected rights, of which the relevant policymakers had actual or constructive notice." *Hyun Ju Park*, 952 F.3d at 1142. Deliberate indifference also may be shown if a policy is "so facially deficient that any reasonable policymaker would recognize the need to take action." *Id.* at 1141.

### 2. Analysis

Sitbon argues that a reasonable jury could conclude that the City has an unconstitutional practice of failing to discipline Lehman. The parties dispute whether the Portland Police Bureau ("Bureau") had a custom of failing to discipline Lehman, and if so, whether that custom amounts to deliberate indifference of Sitbon's rights and was the moving force behind the violation of Sitbon's rights. Sitbon provides three examples from the summer of 2020 where Lehman incurred sustained violations of the Bureau's Use of Force Policy. *See* ECF 64 at 3-4. Sitbon notes that the highest level of discipline Lehman faced is a one-day suspension and that Lehman stated at deposition that the sustained violation did nothing to change the way Lehman approaches his work. The City argues that it properly investigated the incidents of force and penalized Lehman appropriately, and thus, that its practice did not amount to a policy of deliberate indifference.[10] The City also argues that Sitbon's examples of alleged failure to discipline Lehman could not be the moving force behind Sitbon's rights violations because Sitbon's encounter with Lehman occurred *before* the City sustained the three use of force findings.

---

[10] Lehman's three sustained violations resulted in command counseling, a letter of reprimand, and a one-day suspension without pay, respectively.

The Court agrees with the City that Sitbon's examples of alleged failure to discipline Lehman could not be the moving force behind the encounter on August 6, 2020. The first incident occurred on April 26, 2020—more than three months before the encounter with Sitbon—but the report sustaining Lehman's conduct as violating Bureau policy was not published until September 29, 2020. *See* ECF 64 at 10. The second incident occurred on August 1, 2020—five days before the encounter with Sitbon. *See id.* at 74. The incident was not reported to the City until September 11th, and the investigative report sustaining the reported violation against Lehman is dated July 8, 2021. *Id.* at 4, 74. The third incident occurred on September 23, 2020, more than a month after the encounter with Sitbon and was not reported until October 16th. *Id.* at 4. Sitbon has not explained how these three incidents—all of which were investigated *after* August 6, 2020—could have been the moving force behind Lehman's decision to use force against Sitbon on August 6th.

The City notes, and the Court discusses here, the Ninth Circuit's statement in *Henry v. County of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997), that "post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry." In *Shasta*, a motorist who was jailed following a traffic stop sued the county, alleging that the county exhibited deliberate indifference toward violation of rights by stripping and detaining people stopped for minor, non-jailable traffic offenses. *See id.* at 518-19. The court reviewed declarations prepared by two individuals who underwent similar treatment *after* the plaintiff did; the court explained that this evidence was sufficient at summary judgment to show that "such abuse of people who commit minor infractions is 'the way things are done and have been done' in Shasta County, and thus would allow a jury to make a finding as to the existence of a policy or custom." *Id.* at 520.

Unlike in *Henry*, however, Sitbon's position is not that the City has a widespread policy or practice of deliberate indifference of failing to discipline *officers generally*—for which examples of incidents, including post-hoc incidents, could be probative evidence—but rather that the City has a policy of failing to discipline *one* officer *and* that *this failure* was the but-for cause to Sitbon's injury. *Henry*, thus, does not answer the question here. *Cf. Washburn v. Fagan*, 2006 WL 1072057, at *5 (N.D. Cal. Apr. 21, 2006) (finding *Henry* "clearly distinguishable" because the plaintiffs focused on the city's failure to discipline a single officer rather than "a widespread pattern of abuse by numerous individuals" (quotation marks omitted)), *aff'd*, 331 Fed. App'x 409 (9th Cir. 2009). Moreover, for the reasons discussed above, the fact that two of the three incidents involving Lehman were reported to the City after August 6th and all three incidents were investigated only after August 6th indicate that the City's alleged failure adequately to address these incidents could not have been the "moving force" behind Lehman's conduct on August 6th. Accordingly, Sitbon has not presented evidence that the City's alleged policy of failing to discipline Lehman was the moving force behind Lehman's use of force on August 6th. The Court grants summary judgment in favor of the City with respect to this claim.

## CONCLUSION

For the reasons stated in this Opinion and Order, the Court GRANTS Lehman's motion for summary judgment, ECF 50, based on qualified immunity. The Court also GRANTS the City of Portland's motion for summary judgment, ECF 55, based on lack of causation.

**IT IS SO ORDERED**.

DATED this 23rd day of June, 2025.

_____
Michael H. Simon
United States District Judge